ARMSTRONG and Others *v.* THE BOARD OF COMMISSIONERS of DEARBORN County.

By a statute of 1827, commissioners were appointed to re-locate the seat of justice for *Dearborn* county, and were authorised to receive donations, &c. The statute provided, that as soon as the public buildings were completed

at the designated place, that place should *forever* thereafter be the permanent seat of justice of the county. The commissioners fixed the seat of justice at *Lawrenceburgh;* receiving from certain persons as a donation, an obligation conditioned for building a court-house there of a certain description. The court-house was accordingly built by the donors conformably to their contract, the expense of which was 2,500 dollars.

By a statute of 1835, commissioners were again appointed to re-locate the seat of justice of the same county; but the statute made no provision, in case the seat of justice should be removed from *Lawrenceburgh,* for the re-payment to the donors of the money they had expended in building the court-house. These commissioners fixed the seat of justice at *Wilmington.*

*Held,* that the statute of 1835, under the authority of which the seat of justice was removed to *Wilmington,* was not unconstitutional; and that the removal could not be objected to by the persons who built the court-house at *Lawrenceburgh,* merely because they had not been repaid the expense of building it.

Nov. Term,
1836.

ARMSTRONG
v.
THE BOARD OF
COMM'RS. &c.

APPEAL from the *Dearborn* Circuit Court.

Saturday,
December 31.

M'KINNEY, J.—This is a petition filed by the board of commissioners of the county of *Dearborn* in the Circuit Court of that county.

The commissioners in substance state, that by an act of the general assembly of the state, entitled "An act providing for the re-location of the seat of justice in the county of *Dearborn* and for other purposes," passed in the year 1835, certain commissioners were appointed to re-locate the seat of justice of *Dearborn* county; that a majority of the commissioners so appointed, met at the time and place designated in the act, and being sworn, &c., after having viewed the different sites, &c., adjourned until the 18th of *May,* 1835; that on that day they again convened, and proceeded from said 18th of *May* until the 20th of said month, to consider sites at or near the centre of said county of *Dearborn,* and all other situations and sites offered for their consideration, and having also taken into view and paid due regard to the present and probable future population of said county, and a more suitable situation and convenient site in the opinion of said commissioners for the seat of justice in said county not being found, they, the commissioners, did then and there re-locate the seat of justice for said county on the land, &c. adjoining the town of *Wilmington* in said county, to wit, on, &c.; that· the said commissioners did on said 20th of *May,* agreeably to the provisions of the said act of the general assembly, certify their proceedings and re-location under their hands and seals to the record-

27

er of said county, which, together with other papers filed by the commissioners, have been recorded by the recorder of said county; that afterwards, to wit, on the 9th of *September*, 1835, the board of commissioners of *Dearborn* county were advised of the proceedings, report, and recording of the report of said commissioners, appointed, &c.; that the board of commissioners of said county did enter the same on their record, and did afterwards in the said month of *September*, order and appoint *Stephen Woods*, &c. commissioners to superintend the erection and completion of a court-house and jail, on the site of the seat of justice designated in the report aforesaid of the commissioners appointed by the act, &c.; that the commissioners appointed to superintend the erection of the public buildings were residents and freeholders of the county, and before entering upon the duties assigned gave bond, &c., approved, &c.; that the buildings were erected agreeably to the order of the board of commissioners, and being so erected and completed were, on the 11th of *March*, 1836, examined and received by the board of commissioners of said county, and the commissioners appointed to superintend, &c. and their sureties discharged, &c. The petition concludes, by moving the Circuit Court to adjourn to the court-house in *Wilmington*, and that it make such other and further order, &c.

*Walter Armstrong* and others, the appellants, entered their appearance as defendants to said motion, and pleaded *actio non*, because they say, that by the provisions of an act of the general assembly of this state, approved 26th *January*, 1827, entitled " An act for the re-location of the seat of justice in the county of *Dearborn*," certain commissioners were appointed to re-locate the seat of justice of said county; that the said commissioners were authorised to receive donations to erect the necessary public buildings at the site they should select as such seat of justice, and to take the necessary bonds and deeds from the donors so as to enforce the contracts. They aver that a majority of said commissioners did agreeably to said act meet, &c., on, &c., and after taking the oath, &c., proceed to the discharge of their duties, and did on, &c., finally and permanently establish the seat of justice of said county in the old town of *Lawrenceburgh*, where the court-house now stands; that the commissioners did then and there in writing, &c., certify to the recorder of said county, to be by him re-

corded, that they had agreeably to the provisions of said act, <span>Nov. Term, 1836.</span> met as aforesaid on, &c., at, &c., and having been duly sworn, had from day to day proceeded until the said day, &c., to <span>ARMSTRONG v. THE BOARD OF COMM'RS. &c.</span> view the different sites near the centre of said county, and all other situations and sites offered for their consideration, and had also taken into view and paid due regard to the present and future population of said county, and that in their opinion, they could not select a site more convenient for the said county of *Dearborn* than the old town of *Lawrenceburgh*, on section, &c., and that the seat of justice was permanently located there. They aver, that before said commissioners had finally re-located said seat of justice, to wit, on, &c. they with, &c., proposed to the said commissioners that they would pay and furnish at their own proper costs, charges, and expense, money to build a court-house for said county, equal in value and convenience to the court-house in the county of *Franklin*, &c., if they the said commissioners, under the said act, would make the said town of *Lawrenceburgh*, *forever*, the permanent seat of justice of said county, and that they would pay the money in instalments as follows, &c.; that the commissioners accepted said proposition, and contracted with them the said *Armstrong*, &c., that they would re-locate said seat of justice in the town of *Lawrenceburgh*, if they would pay, &c.; that the said *Armstrong*, &c., in consideration thereof, made their bond payable to the board doing county business, that they would pay the money to erect the proper court-house, &c., and that the said commissioners did, therefore, permanently locate said seat of justice in said town, &c. They aver, that they did pay and furnish a sufficient sum of money to erect said court-house, of the value and convenience of the court-house in *Franklin* county; that the said court-house was accordingly in due time properly erected and finished, and was and is of equal value, &c. to that in *Franklin* county; and that they paid a large sum of money, to wit, 2,500 dollars, for the erection and completion of the same. They further aver, that by the provisions of said act, the said seat of justice was *forever* permanently located and fixed in the said town of *Lawrenceburgh*, where the court-house was finished in manner aforesaid, and where all Courts were to be *forever* thereafter held; and that the seat of justice has ever since been there located, &c. They aver that they have a vested interest in the said seat of

Nov. Term, 1836.

ARMSTRONG
v.
THE BOARD OF
COMM'RS. &c.

justice remaining *forever* fixed where it now is, to wit, at the town of *Lawrenceburgh;* they having for a valuable consideration in manner and form aforesaid, purchased that interest by the payment of the sum of 2,500 dollars; and that it cannot be removed or the sittings of the Court adjourned from thence, until they are paid and satisfied the said sum of money so expended. They aver that the said sum of 2,500 dollars has not been paid to them, nor any part thereof; that there is no provision in the statute under which this motion is made, for their payment or indemnity; and that therefore the seat of justice cannot legally be moved from, nor the Court legally adjourned to, any other place than the said court-house in said town of *Lawrenceburgh,* &c.

There was a general demurrer to this plea, and a judgment sustaining the demurrer. To reverse that judgment this appeal is prosecuted.

Together with this case, a bill in chancery praying an injunction, and filed by the appellants in the case just stated, against the appellees and others, is also submitted. The injunction was refused, and the bill on demurrer dismissed for the want of equity. The matters charged in the bill, as the ground for the injunction and for relief, are the same used in the plea to the petition. The opinion we pronounce will be decisive of each case.

In these cases there are presented to our consideration several important questions, which justly demand and have received the most careful and deliberate attention. Although we regard the questions before us to be important, we are of opinion that an application of established principles to the facts disclosed, strips them of a difficulty in their settlement, with which, by the ingenious and elaborate arguments of counsel, they have been clothed. Before we proceed to the examination of the positions taken by the appellants, to reverse the judgments of the Circuit Court, we will recur to some principles inseparably connected with a correct view of these cases, and then notice the two acts of the general assembly of the state, supposed to be in conflict with each other.

The principal question before us involves the rightful exercise, by the legislature, of the power to locate the seat of justice of a county. That power is not denied, indeed it cannot be denied; but it is contended, that it has been so exercised in

*Dearborn* county as to create a contract, by which certain interests have acquired a vested character, and therefore no change of the seat of justice can afterwards be made which would divest those interests, without impairing the obligation of a contract. As the power of the legislature to establish seats of justice in the several counties is conceded, that power must be founded upon the general right appertaining to that body, to promote the interests and convenience of the people. Our counties are all incorporated. They are public corporations, created for public political purposes; and the whole interest in them belongs to the public. The legislature have, therefore, in the language of *Kent*, "under proper limitations, the right to change, modify, enlarge, or restrain them; securing, however, the property for the uses of those for whom it was purchased." He further says, "a public corporation, instituted for purposes connected with the administration of the government, may be controlled by the legislature, because such a corporation is not a contract within the purview of the constitution of the *United States*." This is also the doctrine laid down by *Story*. 2 Kent's Comm. 245.—3 Story's Comm. 260. A county, then, being a public corporation, instituted for purposes connected with the administration of the government, is properly the subject of control by the legislature. With us, the exercise of this power in changing and altering the bounds of counties, either adding to or taking from them territory, and in re-locating seats of justice, is frequent. The right of exercising this power has never been questioned. It is a power incident to sovereignty, and secured by the constitution.

The re-location of a seat of justice in a county, when demanded by the people of such county, with a view to the advancement of public interests and convenience, is a duty from which a legislature could not shrink. If after the location of a seat of justice, and its continuance for many years, individual interests should become identified in its permanency, but these be opposed by the paramount interests and convenience of the public, and a re-location be made,—what is the situation of such individual interests, if deteriorated and affected in value by such re-location? Is the public bound to repair losses and afford indemnity? This question can only be answered in the negative. Such losses would be consequential

upon the exercise of a public right. They are in the class of cases to which the maxim "*damnum sine injuria*" applies. Such losses are frequently sustained, when from public convenience and necessity a change of a road, a canal, or a railroad may be demanded and made. The lesser interests, those of individuals, must yield when in conflict with the greater, those of the public. The building of a town or a village may have been superinduced by positive advantages, afforded by a location on a canal, yet, if public convenience and necessity and the interests of the state demand a change, that change can certainly be made without liability to indemnity, however fatal and disastrous it may prove to the interests of individuals.

With these remarks upon the power of the legislature over public corporations such as counties, we will proceed to the examination of the two acts of the legislature which are brought before us. As the act of 1827 is that on which the appellants base their claim, we will precede its examination by a general and indisputable proposition, which is, that if the act itself did not create a contract with the appellants, or empower the commissioners appointed by it to enter into such contract, in locating the seat of justice, and such contract was entered into, the commissioners transcended their powers, and the contract is invalid. We shall cite such portions of the act as may seem applicable to the question of contract.

The first section appoints the commissioners and thus defines their duties—"To locate said seat of justice for said county, as near the centre thereof as the situation of the land and the interests of the county will admit, having due regard to the present and probable future population thereof: provided, said commissioners shall have the right to view every other site equally near the geographical centre with *Lawrenceburgh*, the centre inclusive, and fix on the site most eligible within said bounds; and if the commissioners cannot select a site more convenient for the county, the seat shall be and remain at the town of *Lawrenceburgh*." In this provision, there is no authority given to the commissioners to make the location dependent on a contract, nor are they authorised to make a contract. The authority to locate the seat of justice is specific, and only controlled by a discretion limited to the situation of the land, the interests of the county with reference to

the present and probable future population, and to the eligibil-
ity and convenience of the various sites within the bounds
prescribed. The continuance of the seat of justice at *Law-*
*renceburgh,* depended on the contingency that the commis-
sioners could not select a site more convenient for the county.

If such be the extent of the authority given to the commis-
sioners, it is palpable that they could not make the location
the subject of contract. If a contract had been intended by
the act, we may well presume that language expressive of that
intention would have been used. But it would be an insult
to the legislature, to suppose that such an intention was enter-
tained. We cannot indulge the idea, that in a question of
such moment, as the public interest and convenience of the
people of that county in the place in which the Circuit Court,
the Probate Court, and the sessions of the board doing county
business are to be holden, and all business affecting the great
interests of a county is to be transacted,—the legislature
could commit such interests to the arbitrament of dollars and
cents. Such a conclusion would presume that body unfaithful
to the trust confided to it by the constitution.

We think it cannot be seriously contended, that a contract
is created, or authority to contract for the location of the seat
of justice given, by the second section. That simply empow-
ers the commissioners to receive all donations of land for the
site of said seat of justice, and all donations which may be
made to defray the expense of erecting the necessary public
buildings for the use of said county, and to take all necessary
public bonds and deeds to secure the faithful performance of
such contracts. The commissioners are to receive all dona-
tions of land, &c. for the site of said seat of justice, &c. This
language is plain and unambiguous, and the true interpretation
of the section will be perhaps correctly reached, by answers to
a question it presents. At what time prior or subsequent to
the location, are these donations contemplated to be made?
Undoubtedly after the location; for until that was made, the
commissioners had no authority to accept or receive donations.
To what purposes were these donations to be applied? The
section itself furnishes the answer—that of land, for the site of
said seat of justice, and those of money, &c., to defray the ex-
pense of erecting the necessary public buildings for the use of
said county. Had the location depended on donations, their

Nov. Term, 1836.

ARMSTRONG
v.
THE BOARD OF
COMM'RS. &c.

extent and liberality,—without regard to the intention of the legislature as shown in the first section, and there confined to the situation of the land, interests, and convenience of the people,—would perhaps have determined the site. In support of this view of the section, we will suppose that no donation had been offered. Were the powers of the commissioners thereby arrested, and the act of the legislature a nullity? Surely not. Such a conclusion would be repugnant to the act itself, and to all the principles to which we have adverted. The commissioners performing their duties, must have located the seat of justice; and the only consequence of the refusal of individuals to donate either land or money, would have been that the county of *Dearborn*, to erect the necessary public buildings, &c., must have resorted to taxation. The distinction between a contract and a donation, is too obvious to require exposition. This distinction was acted upon by the legislature.

It would thus seem that the commissioners were not authorised to enter into a contract, nor were they authorised to make the location of the seat of justice dependent on donations. If, however, they did enter into a contract, which is not shown, it is clear that the appellants, having a perfect knowledge from the act of the powers of the commissioners, could not, if those powers were exceeded, avail themselves of a supposed benefit or right arising from an act by the commissioners, itself an evident excess of the powers committed to them. The fund commissioners are authorised to borrow money, and the maximum amount of interest they are to give is fixed. The act appointing the commissioners and defining their duties, is submitted to those from whom they wish to obtain loans, and is itself, in the event of a contract, a part of the contract. If these commissioners should contract for a loan at 6 *per cent.*, when the act only authorises them to give 5 *per cent.*, no one would contend that the contract at 6 *per cent.* was obligatory upon the state. This case is directly parallel to that before us.

There remains to be noticed but one other provision of the act under review. This is found in the sixth section, and thus reads: "So soon as the public buildings shall be completed in the manner aforesaid, at the place so designated, the same shall be *forever* thereafter the permanent seat of justice of said county of *Dearborn*," &c. Argument touching this provision

is rendered unnecessary by an admission of the appellants, that a subsequent legislature is not concluded by the word *forever* here used. The admission is qualified by the suggestion, that if a change be made, the act authorising it must provide an indemnity to the appellants, who, it is contended, have vested rights based upon contract. This question has been discussed, and may hereafter receive additional notice.

We are now arrived, pursuing the course indicated, to the consideration of the appellants' positions. The first is, that the act of 1835 is unconstitutional, being repugnant to the constitution of the *United States*, as it impairs the obligation of a contract.

This position is attempted to be sustained by urging that the act of 1827, and the proceedings under it, are a contract within the meaning of the constitution. Although it seems to have been once doubted, whether grants and contracts by a state, created directly by law, or made by some authorised agent in pursuance of a law, come within the prohibition of the constitution, yet it is settled that they are as much so as the contracts and grants of private persons; and the only question, in order to the operation of the constitutional prohibition, is, do such grants or contracts exist? 3 Story's Comm. 257. 1 Kent's Comm. 388.—*Fletcher* v. *Peck*, 6 Cranch, 87. These authorities likewise establish, that where a law creates a contract, and absolute rights are vested under it, such rights cannot be divested by a repeal of that law. The judicial expositions have, however, confined the prohibition to contracts which respect property or some other object of value, and which confer rights capable of being asserted in a Court of justice; leaving the several states untrammelled in the exercise of sovereign power, in regulating their civil institutions adopted for internal government. See the above-cited authorities.—*Dartmouth College* v. *Woodward*, 4 Wheat. Rep. 518, 629. Mr. Justice *Story*, treating of this distinction says, "The reason is, that it is only a mode of exercising public rights and public powers for the promotion of the general interest; and therefore it must, from its very nature, remain subject to the legislative will, so always, that private rights are not infringed or trenched upon." 3 Story's Comm. 361. The law thus presented is in entire accordance with that noticed in the remarks prefatory to the examination of the act of 1827; and it is

28

obvious, that if the appellants can show that they have rights capable of being asserted in a Court of justice, or that a contract which affected their property has been violated, they are entitled to protection.

From the construction we have given to the act of 1827, and from the conclusion to which we have come, that the act did not create a contract, nor authorise one by the agents of the state, for the location of the seat of justice, it would seem unnecessary to pursue further the investigation of the appellants' first position. As it is, however, pressed with much zeal, and sustained at least by ingenious argument, it may demand a few additional remarks.

If the location *forever* of the seat of justice at *Lawrenceburgh*, in consideration of the appellants erecting the courthouse, is not a contract, it is urged that it is a grant, and that the constitution protects all grants, franchises, immunities, &c. The latter conclusion may be conceded; but, from it, it does not necessarily follow that the appellants have had granted to them a franchise, immunity, or any right capable of being asserted in a Court of justice. It does not follow, because certain rights are protected by the constitution, that they are invested with them. This Court will never hesitate, when rights are shown to exist and are before it for protection, to extend that protection. We cannot, however, pass beyond the case before us, presume rights, and then afford protection. Now it is said the appellants have a right capable of being asserted in a Court of justice. What is that right? It is called a franchise. What is a franchise? They say, from the books, it is "a right to have a fair or a market holden at a certain time and a certain place," &c. Franchises are not only enjoyed in the instance presented, but exist in many other ways. The law regards them as valuable rights, and they cannot be invaded by legislative enactments. 3 Story's Comm. 260. Let us inquire to what the right or franchise claimed by the appellants attaches. To the seat of justice of the county of *Dearborn* and its records. If the claim be available, it clothes the appellants with the power of controlling the general policy of the state, the rights of the people of that county, and the administration of justice in it. The state itself is stripped of one of the inherent and essential attributes of sovereignty. It is compelled,—however imposing its obligation,

however changed from the present may be the future aspect
of things in that county, however general and unanimous may
be the demand of the people for a change of the seat of justice,
required equally by their convenience, necessities, and inte-
rests,—to silence all in the recognition of a principle, not only
incompatible with the spirit of the constitution, but alien to
the institutions of a free people.  Such a claim cannot be sup-
ported.

We will now take up the second position.  The act of 1835
is said to be unconstitutional, because it is in conflict with the
7th sect. 1st art. of the constitution of this state.  That section
declares " that no man's particular services shall be demand-
ed, or property taken or applied to public use, without the
consent, &c., or without a just compensation being made
therefor."

It is readily admitted, that if the legislature should take or
apply the property of a citizen to public use, it must make a
just compensation for it, and that the act which authorises.
the taking or application, should provide for the compensation.
This has been done here; it is believed to be done in every
state of the Union; and is the admitted law of *England*, when
the appropriation of private property has been necessary to the
public interest.  But as the appellants, as seen, have had no.
private property taken, &c., we cannot discover how this pro-
vision of the constitution has been violated.  If the appellants
have suffered a loss by the change of the seat of justice, such
loss, as previously remarked, is consequential, and clearly not
the subject of compensation under the constitutional provision
cited.  This is the proper construction of the constitution, and
the only one of which it is susceptible.  *Callender* v. *Marsh*, 1
Pick. R. 430.

We are therefore of opinion that the Circuit Court decided
correctly, in sustaining the demurrer to the plea of the appel-
lants, as well as in sustaining the demurrer to the bill in chan-
cery, and in refusing the injunction (1).

DEWEY, J., having been of counsel in the cause, was absent.

*Per Curiam.*—The judgment is affirmed with costs.  To be
certified, &c.

*J. Sullivan, S. C. Stevens,* and *G. H. Dunn,* for the appel-
lants.

Nov. Term,
1836.

J. G. *Marshall, D. Kelso* and *W. Quarles,* for the appellees.

(1) Vide *Elwell* v. *Tucker,* Vol. 1 of these Rep. 285.—*Blackwell* v. *The Board of Justices of L. County,* 2 id. 143.