Mr. Justice CATRON
delivered the opinion of the court.
By an act of March 2d, 1S39, the Legislature of Illinois appointed five commissioners to locate a r<*ad and ferry-landing, three hundred feet wide, on the east bank of the River Mississippi, opposite to the city of St. Louis ; the road to extend back to Cahokia Creek. The road and landing were accordingly located ; the distance from the river to the creek be ing about sixty poles. The ferry having gone into operation under the act of 1839, this bill was filed, seeking to obtain a perpetual injunction against an exercise of a ferry privilege, on the ground, among others, that Samuel Wiggins and his assignees were entitled to the exclusive ferry right at that place, by contract with the State of Illinois; and that said contract was violated by *580 the act of 1839, and the establishment of a road and ferry under and by force of its provisions. The Supreme Court of Illinois having decided that the State law, and the acts done pursuant thereto, did not violate the contract made with Wiggins, and that it was not opposed to the Constitution of the United States, that court proceeded, by a final decree, to dissolve an injunction granted nisi, and to dismiss the bill. To reverse this decree, on the grounds stated, a writ of error has been prosecuted to the Supreme Court of Illinois, from this court, under the twenty-fifth section of the Judiciary Act of 1789.
The contract relied on by the defendants was made with Wiggins, by two acts of the Legislature of Illinois. The first act, approved March 2d, 1819, authorizes Samuel Wiggins, his heirs and assigns, to establish a ferry on the east bank of the River Mississippi, near the town of Illinois, and to run the same from lands “ that may belong to him”; provided that said ferry should be put into actual operation within eighteen months from and after the passage of that act. And it was also provided by the second section, that no other person should thereafter establish any ferry within one mile of that established by Wiggins, with this reservation: — “ That if the provisions of the second section of this act shall be made to appear to the' General Assembly to be injurious to the public good, that then, and in such case, the second section may be repealed.” Wiggins had no land of his own on the river near the town of Illinois when the above act was passed; but within less than eighteen months, he acquired an interest in a tract of land of one hundred acres, part of which lay between Illinois town and the river, and extended to a considerable distance above it; and on this tract he established his ferry.
On the 6th of February, 1821, Samuel Wiggins had another act passed in his favor by the Legislature of Illinois, authorizing him to make a turnpike road, to commence on the Mississippi River opposite to St. Louis, on lands that “may belong to him,” and to run across the American bottom to the bluffs. The act further provides : — “ And whereas the said Samuel Wiggins, his heirs and assigns, were authorized to establish a ferry upon the waters of the Mississippi River, near the town of Illinois, in this State, and a sand-bar having been formed since that time opposite said ferry, therefore: —
“ Sec. 5. Be it further enacted, that the said Samuel Wiggins, his heirs and assigns, be, and they are hereby, authorized to remove said ferry on any land that may belong to him or them on the said Mississippi River, under the same privileges as were prescribed by the act entitled, ‘ An act to authorize Samuel *581 Wiggins to establish a ferry upon the waters of the Mississippi,’ approved March 2d, 1819.”
By an act approved January 19th, 1833, so much of the acts of 1819 and 1821 as prohibited another ferry from being established within one mile of Wiggins’s ferry-landing, was repealed. This restriction is, therefore, out of the case.
On the 13th of July, 1822, Wiggins obtained, by purchase from Julia Jarrot, a tract of one hundred acres, lying below the tract first acquired, adjoining thereto on the south, and fronting on the river; and it is upon this tract that the new ferry and ,road were located under the act of 1839. The parties respectively assume, and so the court below held, that the establishment and regulation of ferries across navigable streams is a subject within the control of the government, and not .matter of private right; and that the government- may exercise its powers by contracting with individuals. We deem this general principle not open to controversy; and in regard to so much of the controversy as involves the contract itself, no material difficulty exists as to what principles of law shall govern: only two general principles need be invoked in construing the acts of 1819 and 1821, which are, — First, that in a grant, like this, designed by the sovereign power making it to be a general benefit and accommodation to the public, the rule is, that, if the meaning of the words be doubtful, they shall be taken most strongly against the grantee, and for the government; and therefore should not be extended by implication in Favor of the grantee, beyond the natural and obvious meaning of the words employed; and if these do not support the right claimed, it must fall. Such is the established doctrine of this court, as was held in the case of The Charles River Bridge v. The Warren Bridge, 11 Peters, 544-547. Secondly, if the grant admits of two interpretations, one of which is more extended, and the other more restricted, so that a choice is fairly open, and either may be adopted without any violation of the apparent objects of the grant, if, in such case, one interpretation would render the grant inoperative, and the other would give it force and effect, the latter, if within a reasonable construction of the terms employed, should be adopted.
Testing the contract by these rules, and what are the complainants entitled to, under the acts of 1819 and 1821 ? By the first act, Wiggins was to establish the ferry near the town of Illinois, “ and to run the same from lands at said place which may belong to him.” At the time the act was passed, Wiggins owned no land near the town of Illinois, and if the grant was in the present tense, and extended only to land *582 that was then the property of the grantee, the act of Assembly had no operation, and was worthless. But we suppose the words employed were not restricted to the time when the act was passed; the grantee was allowed eighteen months to put ■ the ferry into operation, and he was to run his boats from his own lands, that is, from lands which might belong to him at the time the running commenced; and for this there was great reason, as the opposite shore lay within another State, and there, also, a ferry-landing had to be secured. The matter was one of speculation •; and lands could not, with propriety, be purchased at high prices before the privilege was secured on both banks. And this construction, as we apprehend, is the one that the Legislature of Uliuois put on the act of 1819 by that of 1821; by which it was admitted that a ferry had been established aceording to the first act, and the grantee .was authorized to remove it to another point, because a sand-bar had been formed in front of the landing'. We therefore feel ourselves constrained to differ from the carefully prepared and able opinion of the Supreme Court of Illinois, found in the record, which holds the first grant to have been inoperative.
We come next to consider the act of 1821. When it was passed, Wiggins had land fronting on the river for nearly a mile, extending both above and below Illinois town, and lying between it and the river. It was all the land he then could desire for the purposes of his ferry and the end of his road. Indeed, it is doubtful whether, under the grant, Wiggins could have gone below his first purchased tract and been “ near the town of Illinois,” becausé his land extended considerably below the town. As the act of 1821 recognized the fact that Wiggins had complied with his contract under the act of 1819, and had established a ferry on land that belonged to him, and that it was established “nearthe town of Illinois,” it is fair to presume that both parties to the contract, as modified and enlarged by the act of 1821, understood what land it was that Wiggins owned at that time, and the boundaries thereof: and also the extent of his interest, being two sevenths of the tract.
The act of 1821 was treated by the bill, and was relied on in argument, as conferring a perpetual privilege on Wiggins, and on his assigns, to remove the ferry to any land that might belong to him, or to them, at the time of the removal; and, furthermore, that the right of removal was unrestricted as respects time, and could have been made at any time heretofore, or could be made hereafter.
That the act is somewhat obscure, in regard to the place to which the ferry could be removed, must be admitted; and in' *583 seeking its true construction, several considerations present themselves. In the first place, that the act operated in the present tense, and was a mere enlargement of the privileges conferred by the act of 1819, and must be taken as a part of the first contract, cannot be denied; secondly, when we take into consideration the fact that Wiggins had a specific tract of land at that time, at the proper place, — that is to say, lying in front of Illinois town, and extending above and below it, — a reasonable conclusion is, that' some place on such tract was referred to by the act of 1821; and, thirdly, as the act of 1819 reserved authority in the Legislature to repeal so much of the law as secured to Wiggins an exclusive ferry right for two miles on the river front, such reservation could only mean that rival ferries might be established, at discretion, by the Legislature. Nor can it be assumed, with any claim to a plausible construction, that the power of removal had no limitation of time or place, as this would confer a right to remove to the same landing with a newly established ferry, set up as a rival, and drive it away; and thus the public convenience would ' again be reduced to a single ferry. Now, in view of these -facts and consequences, and applying them to language of an ambiguous character, and seeking assistance from a settled rule of construction in case of doubt, and finding that rule of construction to be, that when two construction^ are equally open to the court, the one shall be adopted most favorable to the government, the consequence must be, on this construction, that Wiggins was confined to the tract of land partly owned by him when the act of 1821 was passed; and that when the ferry was removed to other land, lower down the river, it was an act not within the contract, nor protected by it. This disposes of the first and principal ground of relief sought by the bill.
Whether Wiggins,; or those claiming under him, had the right after he had established his new ferry, under the act of 1821, to remove it to another place on the tract of land he then owned, and whether the State of Illinois may not 'authorize another ferry on the same tract of land, not interfering with the operations of the one established by Wiggins, are questions which the record does not bring before,us, and ttpon which, therefore, we express no opinion.
A second ground of relief is relied on by the bill, and was most earnestly and ably urged in argument here, and which it is incumbent on us to dispose of also.
The first special prayer would seem to conclude an inquiry into any ground of interference by this court, other than the *584 question arising on the acts of 1819 and 1821, standing as a contract, claimed to have been violated by the act of 1839. But the bill has also a general prayer; and on this, as well as upon the special prayer, the Supreme Court of Illinois ordered, “ that it be certified in this case, that there was drawn in ques-' tion the validity of the statute of the State of Illinois entitled, ‘ An act to authorize St. Clair county to establish a ferry across the Mississippi River,’ approved March 2, 1839, on the ground that it was repugnant to the Constitution of the United States, and that the decision of the court was in favor of the validity of said statute ” ; frqm which certificate it is manifest that the act of 1839 was upheld against each state of facts set forth by the bill; and if it was apparently repugnant to the Constitution on either ground assumed, this court has jurisdiction of the cause; and having jurisdiction, the plaintiifs in error were entitled to be heard, and are entitled to our judgment, on both grounds presented, and relied on to reverse.
The bill sets forth that gross abuses were imposed on complainants by the act of 1839, and by the commissioners and their lessee, under the act; that the said three hundred feet include a wider space, and more land, than is necessary or convenient for a road, and but a small portion of it has been used and appropriated by the said county of St. Clair to that purpose, leaving a strip on either side to be used by the said county of St. Clair and its lessees, for private property, for building lots, and other 'private purposes; and that that portion of the said three hundred feet which is not included in said road, and which is now. used for private purposes, or is left to be thus used, will yield an annual ground rent larger than the whole amount of the damages assessed as aforesaid for the whole of said three hundred feet; and furthermore, that only the condemned land was valued, and no compensation awarded or tendered for the ferry franchise and landing taken from complainants.
As the bill was demurred to, and the demurrer sustained in the State courts, aqd'in this form the case comes before us, all charges of abuse and oppression on the part of the authorities of Illinois are admitted, to the extent alleged; and the question presented here on these facts is, whether this court has power to redress'the injuries complained of, under the twenty-fifth section of the Judiciary Act of 1789.
The Constitution having declared that no State shall pass any law impairing the obligation of contracts, it becomes our duty to inquire whether, the State law, and the acts done under it, violate a contract. .If. any contract was violated under the *585 act of 1839, it must have been a grant to land vesting the fee simple title; and such title complainants exhibit. To the width of needful roads and ferry-landings, property can undoubtedly be taken, for the purposes of such easements; and necessarily, the State authorities must decide, (as a general rule,) how much land the public convenience requires. That the power may be abused, no one can deny; and that it is abused, when private property is taken, not for public use, but to be leased out to private occupants to the end of raising money, is too plain for reasoning to make it more so. Such an act is mere evasion, under pretence of an authorized exercise of the eminent domain ; and if it be an evasion, it is void, and may be redressed by an action at law, like any other illegal trespass, done under assumed authority; as, for instance, a trespass by a younger grantee on land held by an elder patent depending for support on a State law of later date than the first grant. But it is not an invasion and illegal seizure of private property on pretence of exercising the right of eminent domain, and which act is an abuse claiming the sanction of a' State law, that gives this court jurisdiction; such law, and the acts done under it, are not, “the violation of a contract,” in the sense and meaning of the Constitution. It rests with State legislatures and State courts to protect their citizens from injustice and oppression of this description. The framers of the Constitution never intended that the legislative and judicial powers of the general government should extend to municipal regulations necessary to the well-being and existence of the States. Were this court to assume jurisdiction, and reexamine and revise State court decisons, on a doubtful construction, that an interest in land held by patent was a contract, and the owner entitled to constitutional protection by our decision in case of abuse and trespass by an oppressive exercise of State authority, it would follow, that all State laws, special and general, under whose sanction roads, ferries, and bridges are established, would be subject to our supervision. A new source of ' jurisdiction would be opened, of endless variety and extent, as, on this assumption, all such cases could be brought here for final adjudication and settlement; of necessity, we would be called on to adjudge of fairness and abuse to ascertain whether jurisdiction existed, and thus to decide the law and facts; in short, to do that Which State courts are constantly doing, in an exercise of jurisdiction over peculiarly local matters; by which means a vast mass of municipal powers, heretofore supposed to belong exclusively to State cognizance, would fie taken from the States, and exercised by the general government, *586 through the instrumentality of this court. That such a doctrine cannot be maintained here has in effect been decided in previous cases ; and especially in that of Charles River Bridge v. Warren Bridge, 11 Peters, 539, 540, where other cases are cited and reviewed.
For the reasons above stated, it is ordered that the judgment of the Supreme Court of Illinois be affirmed..