| 27   603|
|c77   254|

### WELLS v. COLE.

STATE SCRIP—*Not receivable in payment of county or school district tax.*—
The Legislature cannot make the certificates of State indebtedness and
Auditor's warrants receivable in payment of county taxes, or school district
taxes.

SAME—Where the Legislature authorizes money to be raised for one purpose,
the funds so raised cannot be applied to another and different purpose, but
each levy is a separate and distinct tax and must be discharged in *money*, or
by a warrant drawn on that particular fund.

APPEAL FROM DREW CIRCUIT COURT.

HON. HENRY B. MORSE, *Circuit Judge.*

*A. H. Garland,* for Appellant.
*T. D. W. Yonley,* for Appellee.

McCLURE, C. J.—The appellant, desiring to pay taxes due on
his lands, in Drew county, tendered to the collector of said
county the amount due thereon in what is commonly called
"Treasurer's certificates." For the amount *due the State*, the
collector signified a willingness to receive the "Treasurer's
certificates," but declined to receive said certificates in pay-
ment of the taxes *due the county*, on the ground that the County
Court of said county had instructed and ordered him "not to
receive State scrip or Auditor's warrants for the payment of
county taxes, or the school district tax." To compel said
collector to receive said "Treasurer's certificates" in payment
of said taxes, the appellant applied to the Drew Circuit Court
for *mandamus*, which said court refused, and the case is
brought here by appeal.

The sole question presented by the record is: Can the
Legislature make the certificates of State indebtedness and
Auditor's warrants receivable in payment of county taxes or
school district taxes?

The first act, which authorized the issue of Treasurer's cer-
tificates, was approved July 23, 1868, and provides that said
certificates shall bear eight per cent. interest per annum, and

be receivable for all *State dues* and *State taxes*, except taxes for school purposes, and be printed on bank note paper, in sums of one, two, five and ten dollars respectively. On the 16th of March, 1869, the legislature passed another act (that of July 23, 1868, having expired by limitation), authorizing the issue of Treasurer's certificates similar to those issued under the provisions of the last named act, which were to bear five per cent. interest per annum, and were receivable for State taxes and debts due the State, except taxes for school purposes and debts due to the school fund.

On the 24th of March, 1869, the General Assembly passed another act authorizing the issue of eight per cent. certificates, by the Treasurer, on bank note paper, in sums of one, two, five and ten dollars respectively. The first section of said act makes said certificates receivable for all State taxes, special or otherwise, and for all debts due the State. The second section of said act makes said certificates receivable in payment for all State, county and municipal taxes, and all collectors are required to receive the same, when tendered, in payment for taxes for State, county, school and municipal dues, at the face thereof, and accumulated interest.

On the 15th of March, 1871, the General Assembly passed another act repealing the last mentioned act, and authorizing the issue of five per cent. certificates, making the same receivable for all State and *county* taxes, and all other taxes due the State, except interest on the public debt.

In the revenue act, which was passed ten days after the above recited act, is found the following: "He (the collector) shall receive county warrants in payment of county taxes, the orders or warrants that may be payable upon presentation, of any township, town or city, for their respective taxes, and the warrant of Auditor of State or Treasurer's certificate of indebtedness, for State taxes."

This last act does not say that Treasurer's certificates and Auditor's warrants shall not be received in payment of county and municipal taxes; it only enjoins upon the collector to re-

ceive county and municipal taxes in warrants, issued by proper authority, when tendered, leaving the exception of the Treasurer's certificates and Auditor's warrants an open question as to whether county and municipal taxes could be paid with Treasurer's certificates, if the tax-payer did not have county or municipal warrants. It may be urged that the language used in the revenue act of March 25, 1871, evidences an intention to prohibit the reception of Treasurer's certificates for county or municipal taxes. All this may be true, but we prefer, or will assume, for the purpose of argument, that the tax-payer had the option to pay all his taxes—State, county and municipal—in the Treasurer's certificates, and this we do for the purpose of meeting the question presented in its strongest light. The question stated, and the one presented, is: Can the Legislature make Treasurer's certificates of indebtedness receivable in *payment* of county and school district taxes?

Counties are *quasi* corporations, organized as a part and parcel of the State government, to subserve the public interest, and to this end, and in order to accomplish this object, certain corporate powers are conferred upon them. The building of bridges; the improvement of roads; the support of the poor; the erection and care of county buildings; the payment of interest and principal of bonds issued by counties to aid in public improvements; the payment of expenses incurred in the support and maintenance of courts of justice, and the *payment* of all officers and persons entitled by law to compensation for the duty performed or enjoined, and many others that could be named, are among the things which the county authorities are required to levy a tax for the *payment* thereof.

· Under chapter one hundred and forty-seven of Gould's Digest, regulating the assessment and collection of county revenue, the County Court is authorized to levy a *county* tax to defray the expenses contracted and incurred by the several counties. The amount so levied was denominated a " county

tax," and when so levied and collected, the amount, thus obtained, was subject to distribution and appropriation for the internal improvement and local concerns of the county; for the payment of viewers, reviewers and overseers of the road; the erection of bridges, and the keeping of the same in repair; the maintenance of paupers; the erection and repair of county buildings, and the payment of the ordinary expenses of the county. The law, in this respect, has been changed, and the objects for which a county may levy and collect a tax are specfically enumerated by law, and must be distinctly stated when levied, and when collected, constitute separate and distinct funds. *Section* 74, *Revenue Law of* 1871 says: "The County Court of each county shall, on the first Friday after the first Monday of October of each year, determine the amount to be raised for ordinary county purposes— for public buildings; for the support of the poor; for bridges; for roads, and for interest and principal on the county debt. The County Court shall set forth upon the record of proceedings, specially, the amount to be raised for each of the above defined purposes. The county clerk shall carefully ascertain the net amount collected for each purpose under said levy, and it shall not be lawful to use any specific fund for any other purpose than the one which the same was specifically levied, until the purpose for which such tax was levied shall have been accomplished."

The one hundred and forty-sixth section of the revenue act, of March 25, 1871, makes it unlawful for the County Court to levy a greater amount than five mills on the dollar for "ordinary county purposes;" that is, for the payment of the ordinary expenses of the county; for bridge purposes, not exceeding one mill on the dollar; for road purposes, not exceeding one mill on the dollar; for the support of the poor, not exceeding one mill on the dollar; for the erection or repairing of public buildings, not exceeding two and one-half mills on the dollar; for the payment of the interest on the funded debt of any county, or the payment of such funded debt or parts

thereof, such an amount as may be actually necessary; for the payment of the interest on any railroad bonds issued by any county as may fall due within the current year, or next succeeding year, such an amount as may be necessary, not exceeding five mills on the dollar.

The object of thus classifying and designating the objects and amounts which might be levied and collected by county authorities, must be obvious to all, and it must be equally apparent that the county authorities have no power to levy taxes for purposes other than those mentioned by some act of the Legislature. To illustrate, we will suppose the County Court desired to erect a county jail or court house, or to pay the interest upon her bonds issued to railroads, and that the outstanding warrants of the county were greater than the levy of five mills on the dollar would take up, within that year, the result would be, if the warrants drawn on the county treasurer, to pay the *"ordinary expenses of the county,"* were receivable in payment of the levy made to pay the interest on railroad bonds, or in payment of the tax levied to build a jail or a court house, that the specific object of the levy would be defeated; but if on the other hand, as the law contemplates, these levies are kept as separate and distinct funds, and only payable in the warrants drawn thereon, the object for which the levy was made may be accomplished, and the persons entitled thereto paid the amount due them from the particular fund. In the case of the *People v. Stout*, 23 *Barb*, 338; this principle was discussed, and it was held that where the Legislature authorized money to be raised for one purpose, that the fund could not be misapplied. Each levy is a separate and distinct tax and must be discharged in *money*, or by a warrant drawn on that particular fund.

We have seen where a diversion of a fund would lead to, and what would ensue if one fund of a county could be absorbed or paid by warrants drawn on another. State scrip, as it is sometimes called, is not *money;* that is, it will not pay a debt existing between individuals; that it is not at par, or

worth to the holder what it calls for on its face, this court has had more than one reason to believe within the past year. It is insisted, by the appellant, that when a county takes State scrip, that it is but the State taking her own paper. We presume such an assumption arises out of the fact that the State created the counties, and that a payment to an off-spring is a payment to a parent. Such is not the law. The counties incur debts and obligations which they are bound to discharge *in money*. State scrip is not *money*, and the Legislature cannot make it so. If counties or school districts are compelled to receive Treasurer's certificates and Auditor's warrants for county taxes proper, or in payment of the taxes authorized to be levied by the County Court or school districts, or county authorities, they would be unable to pay the creditors of the county or districts, or to carry into effect the objects for which the taxes were levied. The funds raised for various purposes, by taxation, would be virtually vested in "State scrip," and the creditors of the counties and other bodies deprived of money specifically raised to pay them. The State has no power or authority to require the different organizations or counties of the State to invest the taxes collected in certificates of indebtedness, and this would be the result and effect of such a law, if the position of the appellant is correct. Counties and similar organizations have a right to demand the collection of their taxes in lawful money of the United States, if there be no warrants outstanding, which are entitled to payment out of the money when collected, tendered in payment thereof.

The view we have taken, of this case, renders it unnecessary to refer to that clause of the Constitution of the United States which inhibits the States from emitting "bills of credit," or whether a treasurer's certificate comes within the definition or description of the thing called "bill of credit."

Judgment affirmed and mandamus denied.

GREGG, J., dissenting says : This action was brought to

test the validity of the Act of the General Assembly providing for the payment of county and school taxes in State Treasurer's warrants, and in the range of argument has embraced municipal taxes.

While we have arrived at a different conclusion from that reached by a majority of the court, we distinctly announce that a State has no right to emit bills of credit, or to issue notes or bills and make the same a legel tender; because, to that extent, she has parted with her sovereignty. And it is equally well known that a State cannot impair the obligation of contracts, or destroy private vested rights, because the Constitution of the United States is paramount, and by it such rights are protected. While we concede that a State is bound to observe all the rights protected by the Constitution of the General Government, beyond this, we hold that, within her own jurisdiction, she is sovereign and without the control of any lawful power.

Next, we assume that a Legislature, as the representative of the people, is a representative of sovereign power, and has dominion and control over all the property and effects within the State, except wherein it is limited by Constitution, either State or National; other departments of a State may exercise all such authority and power as may be granted them respectively by the Constitution, but it is left alone to the Legislature to do everything not expressly prohibited by constitutional limitation. This has been so often repeated, that certainly no one can now be found who doubts the absolute power of the Legislature, except wherein it is restricted by a Constitution.

With this announcement of fundamental principles, we will proceed to examine the statute under consideration.

This Act provides that these State Treasurer's certificates shall be issued, on bank note paper, in sums of one, two, five and ten dollars, and that they shall be receivable for all State and county taxes, and all other debts due the State—Act of March 16, 1871. By the first Act, that of July 23, 1868, for

the issue of Treasurer's interest bearing certificates, they were made receivable for all State taxes, except for school purposes, and all debts due the State, except debts due the school fund. The second Act, March 16, 1869, provided for a similar issue. And the third Act, March 24, 1869, provided for issuing like certificates, to bear eight per cent. interest; and in the second section it is enacted: "That the certificates or warrants issued by the Treasurer of the State of Arkansas, under and by virtue of the Act aforesaid, and all certificates or warrants which may hereafter be issued by said Treasurer in pursuance of law, shall be, and are hereby made receivable in payment for all State, county and municipal taxes, and all debts due the State, whatever; and all collectors of taxes are hereby required to receive said warrants or certificates, when tendered, in payment of all taxes, State, county, school or municipal, for the amount and interest borne on the face of such certificates or warrants."

The last Act, March 15, 1871, continues the issue of Treasurer's certificates or warrants, on bank note paper, but reduces the rate of interest to five per cent. and declares them receivable for all State and county taxes and all other debts due the State, except interest on the public debt.

Under the provisions of these acts, the legislative will is quite clear. There can be no reasonable doubt as to what they intended should be paid in these treasurer's certificates. Then, under the enactments of the legislature, allowing assessments of taxes upon citizens, for municipal and local purposes, the main and only question is the power of the legislature, by law, to prescribe the kind and amount of effects that counties and towns must receive for such purposes. When considering the political or public rights of such corporations, or quasi corporations, held and exercised for the good of the people, and not confounded with the private property rights they may have, we are of the opinion that the legislature has such power, and, before referring to some special provisions in our laws, we cannot better urge this prop-

osition than to quote what has been written by judges abler than ourselves:

In the Dartmouth College case, 4 *Wheat*, 659, Mr. Justice Washington said: "That as a private corporation, it held rights that could not be taken away by legislative act, as it would impair the obligations of a contract," but he said "there are two kinds of corporations aggregate, viz : Such as are for public government, and such as are for private charity ; the first are those for the government of a town, city or the like, and being for public advantage, are to be governed according to the law of the land * * * of these there are no particular founders * * * there are no patrons of these institutions," etc. Further speaking of public corporations, he says : "Such legislative interferences cannot be said to impair the contract by which the corporation was formed, because there is in reality but one party to it. The trustees or governors of the corporation being merely the trustees for the public * * * these trustees or governors have no interest, no privileges or immunities which are violated by such interference, and can have no more right to complain of them than an ordinary trustee who is called upon in a court of equity to execute the trust." And in the same case, page 629, Chief Justice Marshall said: "If the act of incorporation be a grant of political power, *if it create a civil institution, to be employed in the administration of the government,* or if the funds of the college be public property, or if the State of New Hampshire, as a government, be alone interested in its transactions, *the subject is one in which the Legislature of the State may act according to its own judgment,* unrestrained by any limitation of its power imposed by the Constitution of the United States." See 10 *How. U. S.*, 535.

Mr. Kent, in his commentaries, *Vol. 2, side p.* 305, says: "In respect to public or municipal corporations, which exist only for public purposes, as counties, cities and towns, the legislature, under proper limitations, have a right to change, modify, enlarge, restrain or destroy them," etc. In the case of

*Richmond Co. vs. Lawrence Co.,* 12 *Ill.* 8, Judge Trumbull said: "Public or municipal corporations, however, which exist only for public purposes, and possess no powers except such as are bestowed upon them for public political purposes, are subject at all times to the control of the legislature, which may alter, *modify or abolish them at pleasure."* See 12 *Iredell* (*N. C.*) 304 *and* 328 to the same effect.

In the case of *Bass vs. Fontleroy,* 11 *Texas,* 705, the Supreme Court of Texas says: "The establishment of counties, their boundaries, court-houses, jails, bridges and ferries are all matters of public policy—are dependent on the legislative will for their creation; and according to the rules laid down by the Supreme Court of the United States in the cases of *East Hartford vs. The Hartford Bridge Co.,* 10 *How.* 511, and *Mills vs. St. Clair Co.,* 8. *How.* 569, are equally dependent upon the same will for their continued existence," etc.; and to the same effect, see 7 *Cal.,* 97. In *Montpelier vs. East Montpelier,* 29 *Ver.,* 18, the court say: "The town of Montpelier, as originally created, was invested with the powers of a municipal corporation, and like all other towns in this State, was instituted as an auxiliary of the State in the regulation and establishment of its form of government; the rights and franchises of such municipal corporations can never become vested rights as against the State * * so far as their public and municipal franchises and existence are concerned; it has become a well-settled principle in the courts of this country that the legislature may *exercise over them exclusive control,* and, constitutionally, may enlarge, restrain and even destroy their municipal *existence as the public interest may require.* Such an act defeats no vested rights, nor does it impair the obligation of any contract." Also see 27 *Ver.* 704, and *Cooley's Const. Lim.,* 239, 240 *and* 241.

An individual tax payer, in a corporation, has no vested right in corporate grants that cannot be legislated upon as against the corporation. 25 *Cal.,* 641.

It is not only well settled that a State may regulate the po-

litical acts and franchises of a corporation which are purely governmental, but; likewise, she may control its business affairs and material effects so far as the same appertain to the public. In the case of the *People vs. Howes*, 37 *Barb.*, 440, the Supreme Court of New York held that where a party claimed to have done work for a city, but the corporation denied that any legal contract existed, the Legislature, by law, appointed a board of arbitrators to assess the damage and provided for the payment, by *mandamus*, on the comptroller. The city denied the power to make it submit to arbitration and payment, but the court held, as it was a public corporation, the Legislature had full control over it, and that its charter and franchises were under legislative control. *Dillon, Municipal Corp.*, *p.* 82, *Sec.* 39.

In *Layton vs. The City of New Orleans*, 12 *La. An.*, 515, the Legislature joined Lafayette town to New Orleans under one government, with a provision that the town should pay no tax more than her own liability, to settle the public debt, and that the city of New Orleans should pay all her debt. Afterwards a uniform tax law was passed, and the town of Lafayette made liable for a full proportion of the city debts. It was held that this was not a violation of any vested right; that all towns, cities, etc., were subject to legislative will, and the Legislature could constitutionally impose this tax upon the town.

In the case of *Dennis vs. Maynard et al.* 15 *Ill.* 479, wherein a bridge was commenced by private enterprise, the court say: "It was for a public purpose, and it was competent for the Legislature to require the building of this bridge by a general county tax, or by a precinct or township tax, if the policy was thought best," etc. Further they say: "So it (the Legislature) may direct the county authorities to ascertain and allow past claims upon the public treasury, or it may ascertain and tax that amount, and direct the raising of means by taxation for its payment. The public county and township funds are under legislative control, and so decided in the

*County of Pike vs: The State*, 11 *Ill.*, 202. These local municipal corporations are created for convenience in the police arrangements, but their powers and duties remain subject to the public will through the Legislature." *State Bank vs. Kroop*, 16 *How., U. S.*, 369, *et seq*; *State, etc. vs. St. Louis Co. Court*, 34 *Mo.*, 546; *Louisville vs. Commonwealth*, 1 *Duval (Ky.)* 295; *Dill, Municipal Corp., Sec.* 30, *et seq.* "The Legislature, as the trustee for the general public, has full control over the public property and *subordinate rights* of municipal corporations, accordingly it may authorize a railroad company to occupy the streets in a city without its consent and without payment." *Dill. Municipal Corp.*, 88-89, *Secs.* 42-43. See 31 *N. Y.*, 164; 58 *Penn.*, 320; 24 *Wend.*, 65; 4 *Blackf.* 208; 4 *Scam., (Ill.)* 273.

While the authorities show these municipal corporations and these quasi corporations must submit to the will of the Legislature in the management and disposition of their public property; they also show them equally helpless in the acquisition of property and means for their public comfort and convenience. They can levy no taxes, make no local assessment or collection but in exact accordance with the expressed will of the Legislature.

In the city of *Zanesville vs. The Auditor of Muskingum County*, 5 *O. S.* 592, it is said: "Without express authority of law no tax, either for State, county, township or corporation purposes, can be levied. * * * The convention was very well aware that much the largest part would be required to answer the purposes of these local subdivisions; and equally well that it could only be levied *as the* General Assembly should provide." In the case of *Nappa Valley R. R. Co. vs. Nappa Co.*, 30 *Cal.* 438, the Supreme Court, in discussing the right of the State to tax and direct the use of the revenue, etc., say: "And except as specially restricted its powers of appropriation of the moneys raised is co-extensive with the power of taxation. It may appropriate them to claims which have no legal obligation, and are founded only in justice.

The power of appropriation which the Legislature can exercise over the revenues of the State, for any purpose which it may regard as calculated to promote the public good, it can exercise over the revenues of a county, city or town for any purpose connected with its present or past condition. In creating the law imposing the tax, it can prescribe the objects to which the money raised shall be applied." See 13 *Cal.*, 343 ; 20 *Cal.*, 642. If this be correct, might not our Legislature have prescribed that this county tax should be applied in taking up State Treasurer's certificates?

In the case of *Gilman vs. The City of Sheboygan,* 2 *Black. U. S.,* 515, the court said: "The levying of taxes by authority of a county, city or town, for their support, is as much an exercise of the taxing power as when levied directly by the State for its support. The State acts by the municipal governments, and their acts in levying taxes are as much the acts of the State as if the State acted by its own officers."

And according to Mr. Cooley, these county and town organizations are so far different from private corporations, and so fully but a sub-division of the State government, that the people residing within these sub-divisions have no choice as to whether they will assume the duties or exercise the powers of such political organizations. The Legislature assumes that these divisions are essential to good government, and the duties are imposed as a part of the necessary burden that the citizen must assume in the process of self-government; and their functions are wholly of a public nature, and all their rights and privileges depend upon the will of the power that created them.

Outside of these general principles, from the very foundation of our State laws, it seems to have been contemplated that the Legislature should create such sub-divisions of State government, and prescribe their powers and duties. *Sec.* 28, *art.* 5, *of our Constitution,* declares that " The General Assembly may enact laws providing for county, township or precinct governments." *Sec.* 48 declares that " The General As-

sembly shall pass no special act conferring corporate powers. Corporations may be formed under general laws, but all *such laws may*, from time to time, *be altered or repealed*," etc. And *sec.* 49, that "The General Assembly shall provide for the organization of cities and incorporated villages, by general laws and restrict their powers of taxation, assessment, borrowing money, contracting debts, and loaning their credit, so as to prevent the abuse of such powers."

Now, if these counties or small districts were not governed upon general principles, as above shown, and as held by the courts of other States, we have these constitutional provisions authorizing the Legislature to create such local governments, and to form corporations under general laws, which laws may at any time be altered or repealed; and when cities or villages are organized, she shall restrict their powers of taxation, assessment, etc. Do not these show beyond a doubt that the framers of our Constitution intended that these sub-divisions of the government should be fully under legislative control? It positively prescribes that they shall restrict them in taxing; then, if the taxing power is left to the General Assembly, can any one else control their action, because the policy seems to be bad?

But, further, *sec.* 9, *art.* 15, *of the Constitution*, expressly provides that these sub-divisions shall share in the want of par funds when such burden is felt by the government of the State; it is therein declared that "all salaries, fees and *per diem*, or other compensation of all State, county, town, or other officers within the State, shall be payable in *such funds as may by law* be receivable *for State taxes.*"

Thus, it is a part of our Constitution, that all officers, including county and town officers, whether paid a salary out of the treasury or paid by the day, or compensated in fees or otherwise, shall accept *such funds* as may be receivable for State taxes. If we had no act of the Legislature declaring that these warrants should pay all taxes, how could the county and town officers, whose high salaries and exor-

bitant fees have proved so burdensome to the people, refuse, in the face of this Constitution, to accept for their public services (which consume most of the county revenues) the warrants receivable for State taxes? They can not refuse such funds, it seems to us, without violating the very Constitution they have sworn to support. Yet, the appellee refuses to take any part of the county taxes in such warrants ; thus, he will compel the tax-payers, contrary to these solemn enactments, to pay all fees and *per diem* for his public services in different and better funds.

But, upon general principles, if authority can be relied upon, these *quasi* corporations are forced into existence, by the will of the State, through her representatives, and the length of such existence and the powers and privileges of such bodies are alike subject to her volition.

From the cases examined, we find that a State may embrace in one of these sub-divisions such territory and so many people as she deems best. She may locate their county seat, direct what public buildings must be erected, and prescribe how the people of the county shall pay for them. She may compel them to settle debts in the mode she points out. She may compel them to pay for work for which they had made no binding contract. She may cause works, supposed to be of public utility, to be completed, and make them pay for it. She may take their streets and other public property, without pay, and convert them to other uses. They can collect no tax, only as she by law particularly points out, and she compels them to pay such taxes and assessments as the will of the State may dictate, and, as they come into existence as a conclusion of her policy, she takes from or adds to their privileges or burdens, or destroys their existence upon her own choice. While we may well question any State policy which throws heavier burdens upon any locality or class of her citizens, yet, if we regard authority, we cannot seriously question her powers. These are political organizations, formed within certain boundaries by the wisdom of the Legislature,

to aid in self-government, and the powers, privileges and burdens granted or imposed for the good of the people and the State, must be left to the wisdom of those who represent the sovereignty of our government.

To urge that it defeats the objects for which taxes are levied, if the counties or towns receive their taxes in these certificates of the State, when they are not worth their face value, is of no more force than to say it defeats a like object to compel the State collectors to take them. The counties need money to carry on their business transactions, but it is equally necessary for the State to have money to meet her obligations.

If the State and counties were separate and distinct organizations, emanating from different sources, and having different objects and purposes in view, that argument would have more force, but while both are of the same political body, the one but a member of the other, the whole created by the people, for no individual purpose or advantage, but for the common good, and to carry out the purposes of self-government, we see less reason and justice in one member claiming exemption from a malady affecting the body politic. But these are simply questions of policy, and must be determined by the sovereignty of the State—not by her courts. They are questions of policy—not of power.

Upon these conclusions we rest our opinion that a *mandamus* ought to issue in this case.