# Mayor, &c. of Mobile, *v.* A. & B. Moog.

### *Action to recover Rent under a Lease.*

1. *Municipal Corporations; powers of.*—Municipal corporations are mere creatures of the State, having no inherent right to govern, and possessing such powers only as are granted by express words, or necessarily or fairly incident to the power expressly granted, or *essential* to the declared objects and purposes of the charter.

2. *Mobile city; authority given by charter as to wharves.*—The purpose of the charter in conferring authority upon the city of Mobile to build wharves on its own property, and to acquire those of others, was not only to give the city control of the wharves and wharf business within its limits, but also to provide, by the revenue derived therefrom, reimbursement for the outlay in building and acquiring such wharves. No authority was given to build or acquire wharves for use without charge, and a lease of a wharf, declaring such a purpose, is *ultra vires*.

[Mayor of Mobile v. Moog.]

3. *Same.*—The power to acquire wharves, for use free of charge, not being given, it cannot be exercised indirectly, by stipulating, as the consideration of the privilege of purchasing the wharf at a given valuation by a certain time, that if not purchased the city will lease the wharf for a term of years, during which it should be free.

4. *Same.*—Such a contract is not divisible ; nor does the city, not having exercised its right to purchase, take the property discharged of the stipulation to keep it as a free wharf, although the lessor may for a time have tolerated this departure from the terms of the lease. Being unlawful in its origin, and remaining unaltered in its terms, the lessor can maintain no action on the lease.

5. *Ultra vires, doctrine of; how applied.*—The invalidity of contracts because *ultra vires,* is more strictly maintained in favor of municipal than of private corporations.

APPEAL from Circuit Court of Mobile.

Tried before Hon. JOHN ELLIOTT.

The facts are sufficiently stated in the opinion.

E. S. DARGAN, for appellant.—If the city had any authority to make this lease, it must be by virtue of some provision of its charter. The sixtieth, sixty-first and sixty-second sections of the charter are relied on ; but these sections construed together, as they must be, show that the object and purpose of the legislature was to give the city authority to obtain, by contract or purchase, the control of all wharves, *for the purpose of raising revenue for the city,* and to establish a uniform system of wharfage. Such a grant cannot authorize a lease of wharves *without raising any revenue* therefrom—in other words, "free wharves." The money to pay this lease must be raised by taxation, and this cannot be done except for purposes authorized by the charter. *Hooper* v. *Emery,* 14 Maine, 375 ; 1 Dillon on Mun. Cor. 104. If it were possible to apply art. 1, § 26 of the constitution of 1867 to this case at all, it would rather prohibit the city from renting or buying wharves, than give it authority to buy or rent. Never having power to make this contract, the city could not ratify it.

HERNDON & SMITH, ROBERT H. SMITH and ALEX. MCKINSTRY, *contra.*—Art. 1, § 26 of the constitution declares that no tolls . . . shall be demanded . . . unless expressly authorized by the general assembly. The legislature, by act of Jan. 31st, 1867, granted to the city of Mobile the shore and soil of Mobile river within the boundaries of Mobile. Evidently the legislature was indignant at the oppressive monopoly of private wharf owners, and its purpose, as shown in the charter, when construed with reference to the constitution and the act above recited, was to give the city power,

[Mayor of Mobile *v.* Moog.]

in such manner as its discretion would dictate from time to time, to free the city and its commerce from the evil effects of the monopolies having charge of the wharves. The city authorities were made trustees of the soil and shore of Mobile, to manage, possess and control it "in such manner as they deemed best."

If some of the covenants are good and others against law, the good covenants stand and those against law are void. 31 Ala. 87; 8 Smedes & Marshall, 152; 6 Taunton, 359; 10 Peters, 364. The enjoyment of the wharves was the consideration for which rent was to be paid. If the restriction as to their being free wharves is unlawful, the city has obtained a larger right than it contracted for. *Price* v. *Greene,* 16 M. & W. 346. If the provision for free use of wharves invalidates the lease, because of want of power to make such an agreement, it is only where the State raises the question of abuse of power by *quo warranto.* 7 Ohio, 354; 8 Smedes & Marshall, 151. Having power to make the contract in the first instance, the city, by its acts since, has completely ratified it. 9 Ala. 516; 23 Howard, 397; 1 Peck, 372; 11 Wallace, 476; 2 Black, 722.

MANNING, J.—In August, 1870, a contract was entered into, signed by James Gillette, G. H. Wilcox and L. S. Berry, as "wharf committee" of the city of Mobile, attested by Lou H. Mayer, and approved by George F. Harrington, mayor of the city, with appellees, A. & B. Moog, for a lease by the latter of a wharf structure of eighty feet along the river front of the city, and of their half-interest in an adjoining wharf structure of twenty feet more, to the city of Mobile, for a period of three years from the first day of November, 1870, at an annual rent of $5,500. And the instrument recites that "it is agreed that said wharves shall be kept as free wharves during the term of the lease, and the city shall not underlet the property without the written consent of the lessors." An agreement was added, of which the city did not avail itself, that it might, within sixty days after the contract was made (a period that would expire before the lease was to begin), purchase all the right, title and interest of the lessors in the same property for $25,000 in cash. The same property had previously, through a period of many years, yielded to its owners, in combination with other wharf owners, and as a reasonable annual rent, a sum of from $1,000 to $1,500, in addition to the benefit, worth about the same amount, which they derived from receiving at and shipping from said wharves goods and mer-

chandize of their own. The action is for the first year's rent under this lease.

At a former term, this court decided, upon a demurrer to the complaint as then framed, that the instrument above explained was not the deed of the corporation of Mobile, but of the persons who signed it, and therefore reversed the judgment obtained by appellees in the circuit court. The objection to that complaint is obviated by the amendments since, which aver that the contract embraced in the instrument was made for and on behalf of the city, and was afterwards ratified and adopted by it, and that the property was taken and used by the city in pursuance thereof. And the question now before us is whether the contract is not *ultra vires*, and, therefore, not valid against the city.

Before considering it, though, it is proper to scan some other passages in the instrument, to see what effect they should have on the decision.

The lease contains the following paragraph: "It is the purpose and object of the city of Mobile to render a sufficient amount of river front at the present time free for all commercial necessities, during the continuance of the litigation now existing with reference to said wharves; and while this is done on behalf of the city for such purposes, the city of ʾMobile disclaims any intention whatever of acknowledging or recognizing any right, title or interest of the lessors in or to the soil upon which said wharves have been erected." Why this was incorporated in the lease does not appear. Certainly, if the city was at that time, as we must infer, contending in a suit with the lessors that it was the owner of the soil on which the wharves were erected, and therefore of the wharf property, it is not apparent that any benefit could result to the city by, and be a consideration for, a contract which, although containing the feeble disclaimer above quoted, stipulates, without regard to the issue of the litigation, that the city shall at the expiration of the three years of the lease, or upon the forfeiture of it by non-payment of the rent, "*return* said improvements to the lessors in like good order as when received, save ordinary wear"; and that the lessors should have the right reserved "to fill in their wharf as heretofore," during the lease, but "so as not to obstruct the use of it by the city."

We may, therefore, regard the case as not affected by these provisions in the contract, it not being shown that they derive significance from any statute relating to the matter.

Sovereignty resides only in the entire State. In the municipal or other local communities thereof, or in their magis-

tracies, there is no such thing as an inherent and independent authority or right to govern, by which the communities themselves or any of the members thereof must be legally bound. Submission is due to the obligations which such bodies undertake to impose only so far as the State, in the exercise of its sovereign powers for the general good, has delegated authority to create them. And against acts done without such commission, the tribunals of the State, which owes protection where it demands allegiance, will interpose to shield those who are subject to its control. It is well settled, says SHAW, C. J., "that a town, in its corporate capacity, will not be bound, even by the express vote of a majority, to the performance of contracts or other legal duties not coming within the scope of the objects and purposes for which they are incorporated. *Anthony* v. *Inh. of Adams*, 1 Metc. 286. And it is held, that even the legislature cannot confer on a municipal corporation a right to contract engagements, by which the community may be taxed, to raise or refund money given to private persons in aid of a business or enterprise not of a public character. *Loan Association* v. *Topeka*, 20 Wall. 655.

Judge Dillon, in his work on Municipal Corporations (2d Ed. Vol. 1), states his conclusion respecting their capacities as follows: " § 55. It is a general rule, and undisputed proposition of law, that a municipal corporation possesses and can exercise the following powers, and no others: first, those granted in *express words* ; second, those *necessarily or fairly implied* in, or *incident* to the powers expressly granted ; third, those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied. Of every municipal corporation, the charter or statute by which it is created is its organic act. Neither the corporation nor its officers can do any act, or make any contract, or incur any liability, not authorized thereby. All acts beyond the scope of the power granted are void. Much less can any power be exercised, or any act done, which is forbidden by charter or statute. "These principles," he adds, "are of transcendant importance, and lie at the foundation of the law of municipal corporations."

The power to erect wharves and charge wharfage is not strictly one relating to municipalities; but it is competent for the legislature to make them, in such measure as it may deem expedient, repositories of it. All their powers in re-

spect to wharves and docks must be derived from the State. Dillon on Mun. Cor. §§ 67 and 74.

What authority, then, had the municipality of Mobile in respect to wharves? It is all conferred in sections 60, 61, 62, 63 and 64 of the charter approved February 2d, 1866 (acts of 1865–6, pp. 223–4–5), whereby it is enacted, "That *in order to carry out the system of wharfage in the city of Mobile herein provided for, and to establish dockage charges on vessels, and charges on produce and merchandise,* the mayor, &c., "shall have power and authority to obtain, by contract or purchase, the property in or the control of the wharves and wharf-property" in the city; that there may be appointed a committee of its members, charged "with the carrying into effect of said wharf arrangement, with power to purchase, contract for, arrange and compromise in the name and behalf of the city with all owners of wharves and wharf property, and make all suitable arrangements *to accomplish the object aforesaid,*" &c.; "that said corporation shall have power to *raise a revenue from such wharves and docks* as may be under the control of the said corporation, *by establishing and collecting a rate of dockage and wharf charges to be paid by all persons receiving and shipping merchandise* and other property, *and by all ships, vessels, steamboats, steamships and crafts of every description, trading to, at and from the* port of Mobile," &c.; that a superintendent of wharves may be appointed "to collect and pay out all moneys under the control and direction of the committee, to keep said wharves and docks in repair," &c. and that, to enable the corporate authorities to *carry into full effect the arrangement contemplated by this act,*" the city authorities may levy a special tax, the proceeds of which shall be appropriated" to the building of wharves over such slips as are now, or may hereafter become, the property of the city, or in the construction of a levee or levees, . . . . . and not to any other use or purpose whatever."

The declared object of these sections of the charter is to enable the city to build wharves on its own property along the river front, and acquire those of other persons, and to lay and collect dock and wharf charges for every kind of water craft resorting thereto, and for all kinds of merchandise and other property received thereat or shipped therefrom, with the view and purpose of raising a "revenue from such wharves and docks." If the municipal officers were authorized by such a transaction to impose a burden on the people of the city, it was with the distinct understanding and intent that the latter were thereby not only to secure the

[Mayor of Mobile *v.* Moog.]

control and regulation of the business along the river front of the city, but compensation also for the outlay, by the income to be thus acquired ; and this, being an expressly declared intention of the enactment, is its most explicit object.

Yet the contract made takes pains to provide that this object shall not be accomplished. It stipulates that although the lessors might use these wharves, as free wharves of the city (as advantageously, perhaps, as they had had the use of them for their own business), and although the city authorities should pay to them, besides, about four times as much rent as the property ever before yielded them, yet the wharves should be free to the public during the whole period of the lease ; and that the city, debarred from thus raising income for the relief of its taxed citizens, should not sublet them without the written consent of the lessors. The parties to this agreement, instead of acting in accordance with the law, directly violated it in undertaking to charge upon the city a high rent for the property and at the same time providing that the citizens thereof should not obtain the remunerative or beneficial interest therein, which the statute expressly intended that they should enjoy.

Our attention has, however, been called to the fact, that in the bill of rights to the constitution of 1867–8, by § 26 of article I, it was declared "that no tax, toll, impost, or wharfage shall be demanded or received from the owner of any merchandise or commodity for the use of the shores, or any wharf erected on the shores, or in or over the waters of any navigable stream, unless the same be expressly authorized by the general assembly." If this be operative, and is held to have effect in respect to the wharf property along the river front of the city of Mobile, it is to be observed, first, that by the sections before referred to of the charter of that city, the authority to charge wharfage and dock fees was expressly vested by the general assembly in the corporation of Mobile—an authority which we cannot justly hold was taken away by this constitutional clause ; and secondly, that the effect of this clause was to make the wharves of private persons there free wharves, without the payment by the city of any such large sum of money as that contracted to be paid to appellees. And in this latter case, it would seem to follow that the contract aforesaid, made with appellees, would be obnoxious to the objection that it provided for paying by a taxation of the people of Mobile a gratuity to private persons without any advantage to the public, and was therefore also void. *Loan Association* v. *Topeka,* (*supra*), and cases therein cited.

[Mayor of Mobile *v.* Moog.]

As a mere lease, the contract under consideration is not obligatory on the city of Mobile. Does it acquire validity by being coupled with an agreement that the city might, within sixty days after the date of it, purchase the right, title and interest of the lessors in the property at the price of $25,000?

That the city government might, under the statute, procure this wharf property by a simple purchase of it, we presume will not be denied; or that it might enter into a contract to that end. What price should be given for it, the parties would be allowed to determine for themselves. This court would not interfere, as the cause is now presented, with their valuation. But the city authorities could not, as a consideration for the privilege of purchasing the property within sixty days, validly bind the city, if they did not do so, to take a lease of it afterwards for three years, and make it during that time a free wharf, any more than they could take a simple lease of it on those terms. For, this would be acquiring a power, which only the legislature can confer, by a round-about dealing with individuals. It is argued by counsel for appellees that the question is affected by act No. 278, "granting to the city of Mobile the riparian rights in the river front," approved January 31, 1867, which enacts that "the shore and soil under Mobile river, situated within the boundary lines of the city," be granted and delivered to the city of Mobile in trust, "to hold, possess, direct, control and manage the shore and soil herein granted in such manner as they may deem best for the public good."

We do not perceive, in this enactment, the meaning suggested by the counsel of appellees. It does not express *indignation* at, does not even imply the existence of, an "oppressive monopoly" at Mobile, extorting, through a combination, exorbitant wharf charges. The direct effect of the act, if valid, and its object, would seem rather to be to transfer the right and power of the State in and over the shore of the river, and the soil under it, in front of Mobile to that city, to be exercised by it, as the State should exercise them, for the general good, in preventing the navigability of the river from being impaired, and in restraining purprestures along the river front below the high-water line, by prescribing the manner in which, and the extent to which, wharves and other structures should be built into or over the water. In respect to the exercise of this power, the cases cited below might be advantageously consulted. *Dulton* v. *Strong,* 1 Black's (U. S.) 23; *Yates* v. *Milwaukee,* 10

Wallace, 497; *Hagan* v. *Campbell*, 9 Porter, 9; *Pollard's Lessee* v. *Hagan*, 3 Howard, 212.

Nor can we yield to the argument that the contract is divisible, and that the corporation must be considered as having taken the wharves that were the subject of it, discharged from the stipulation to keep them as free wharves. This stipulation was an essential provision of the contract, specially agreed on, and attaching to the entire property during the whole period of the lease. Although it may have been disregarded for a time, and the lessors tolerated the breach of it, or did not sue the city therefor, this does not change the nature of the transaction, or validate an agreement which was vicious in its origin and substance, because made in violation of law, and remained unaltered in its terms.

The invalidity of contracts because *ultra vires*, is more strictly maintained in favor of municipal than of private corporations.

In *Thomas* v. *City of Richmond*, the supreme court of the United States, through Justice BRADLEY, said: "In cases of bills or other obligations illegally issued by a banking or other private corporation, which has received the consideration therefor, it would enable them to commit a double wrong, to hold that they might repudiate the illegal obligations and also retain the proceeds. Hence, where the parties are not *in pari delicto*, actions are sustained to recover back the money or other consideration received for such obligations, though the obligations themselves, being against the law, cannot be sued on. . . . . . . . . But in the case of municipal and other public corporations, another consideration intervenes. They represent the public, and are themselves to be protected against the unauthorized acts of their officers and agents, when it can be done without injury to third parties. This is necessary in order to guard against fraud and peculation. Persons dealing with such officers and agents are chargeable with notice of the powers which the corporation possesses, are to be held responsible accordingly. The issuing of bills as a currency by such a corporation, without authority, is not only contrary to positive law, but, being *ultra vires*, is an abuse of the public franchises which have been conferred upon it; and the receiver of the bills, being chargeable with notice of the wrong, is *in pari delicto* with the officers, and should have no remedy, even for money had and received, against the corporation. . . . . . . The protection of public corporations from such unauthorized acts of their officers and agents is a matter of public policy in which the whole community is concerned.

[Mayor of Mobile *v*. Stonewall Ins. Co.]

And those who aid in such transactions must do so at their peril." 12 Wall. 356. Much more should this rule prevail in regard to a negotiation like the one now in question. We are constrained to hold that out of it no action can arise in favor of appellees for the recovery of any sum whatever from the city of Mobile.

The judgment is reversed and the cause remanded.

