ATTORNEY GENERAL *vs.* CITY OF BOSTON & others.
JOHN A. LOWELL & others *vs.* SAME.

Suffolk.    November 23. — December 19, 1877.

By the St. of 1852, c. 244, the East Boston Ferry Company was incorporated for the purpose of establishing and supporting a ferry between the main land in the city of Boston and the island of East Boston, and was allowed to collect and receive such tolls as the mayor and aldermen should determine; and the city of Boston was authorized, at any time during the continuance of the charter, to purchase the ferry and franchise of the company, and to issue scrip in payment therefor, and thereupon to collect the same rates of toll as were allowed to the company; provided that whenever the tolls collected should be sufficient to reimburse the city for the cost of the ferry, with annual interest on the scrip, and for all the expenses of the repairs and additions to the ferry, and all current and incidental ex penses of its superintendence and its management, and to provide a sufficient fund for its future support, "then the tolls on said ferry shall cease, and said ferry shall ever after be maintained by said city of Boston as a free ferry." By the St. of 1869, c. 155, § 1, the city council, "for the purpose of improving private property, and of protecting the same and the travel and business between the main land in said city and East Boston from the disabilities and burdens of the ferry communications heretofore existing between said parts of the city, and of furnishing additional facilities to said travel and business," was authorized to purchase the ferry and franchise of the company, and to cause the ferry to be maintained "in such manner and upon such rates of ferriage as the board of aldermen of said city shall from time to time judge the best interests of the said city to require, excepting only as hereinafter provided." By the subsequent sections of this statute, the city council, "upon the completion of said purchase," was authorized to determine whether the interests of the city would be best promoted by maintaining the ferry free of tolls, either "thereafter" or "for a term of not less than ten years next succeeding said purchase;" and, if either of these alternatives was adopted, the board of aldermen was to adjudge whether East Boston, or any and what part thereof, would receive special benefit and advantage from the purchase, and provision was made for the assessment and levy of a portion of the cost upon the owners of real estate in the territory so adjudged to be benefited. In 1870, the city purchased the ferry, and maintained it for seven years afterwards at rates of toll

fixed by the board of aldermen. *Held,* that the city council could not now deter-
mine to run the ferry free of toll.

If the city council of a city, authorized by statute to maintain a ferry at such rates
of toll as the board of aldermen may from time to time determine, orders that the
ferry be run free of toll on and after a future day, this court, on an application
made before that day arrives, may, by a writ of mandamus to the. city council,
compel the city to continue to collect the tolls established by the board of alder-
men.

If the city council of a city, authorized by law to maintain a toll ferry, illegally or-
ders the ferry to be run free of toll, a writ of mandamus may be demanded by the
attorney general.

Two APPLICATIONS for a writ of mandamus to the city of
Boston and to the board of directors for the East Boston fer-
ries; the first by information of the attorney general, and the
second by petition of ten citizens and taxpayers of Boston, and
each containing the following allegations :

That by the St. of 1869, *c.* 155, " the city council of the city
of Boston was authorized to purchase the boats, franchise and
other property of the East Boston Ferry Company, a corpora-
tion maintaining and operating a steam ferry between Boston
proper and East Boston, at such price as might be agreed upon,
and to cause the said ferry to be maintained in such manner and
upon such rates of ferriage as the board of aldermen of the city
should from time to time judge the best interests of the said city
to require, except only as in said act afterwards provided ; that
said act, by its second section, provided that, upon the comple-
tion of the purchase, the city council should consider and deter-
mine whether the interests of the city would be best promoted
by maintaining said ferry thereafter free of tolls, and in case it
should decide the same in the affirmative, that the said ferry
should thereafter be maintained free of tolls, and that in such
case the board of aldermen should adjudge and determine
whether the territory of that part of the city called East Bos-
ton and Breed's Island, or any and what part thereof, would re-
ceive any benefit and advantage therefrom beyond that general
advantage which would be received therefrom by other parts of
the city, and what portion of the cost of such purchase should
be borne by the city, and what portion by the owners of real
estate in East Boston and Breed's Island ; and further provided
for the ascertaining, assessing and collecting betterments from
said owners of real estate ; that said act further provided, that

If the city council, upon the completion of the purchase, should adjudge and determine that, instead of maintaining the ferry free of all tolls, it was for the best interests of the city that the ferry should be thereafter operated with more boats and greater facilities for travel and business, and at one cent ferriage for a foot passenger, instead of two cents as theretofore, and with the other rates of ferriage so reduced that the receipts of the ferry should not exceed the cost of operating the same, instead of paying, as provided by the charter of the company, at least eight per cent. annual dividends, then the city should maintain and operate said ferry with such greater accommodations and at such reduced rates, or with such other greater accommodations and at such more reduced rates of ferriage as the board of aldermen might judge expedient from time to time; and further provided for the assessment of a betterment not exceeding one half the cost of the purchase on the benefited estates; that said act further provided that if the city council, instead of adjudging to maintain the ferry free of all tolls, should adjudge and determine that it was for the best interests of the city that the ferry should be maintained free of tolls for a term of ten years next succeeding said purchase, and thereafter upon such rates of ferriage as might then be adjudged by the city, then the city should operate said ferry free of tolls for ten years, and might then assess a betterment as aforesaid not exceeding one half the cost of said purchase." *

---

* The first section of the St. of 1869, c. 155, is as follows: " The city council of the city of Boston, for the purpose of improving private property, and of protecting the same and the travel and business between the mainland in said city and East Boston from the disabilities and burdens of the ferry communications heretofore existing between said parts of the city, and of furnishing additional facilities to said travel and business, are hereby authorized to purchase the boats and so much of the other property, including the franchise, of the East Boston Ferry Company as they shall think expedient, at such price as may be agreed upon between them and the said ferry company, with the approval of the mayor of said city, and to ordain and establish the present or such other lines of ferry travel as they may see fit between the said parts of said city, and to cause the said ferry to be maintained thereon in such manner and upon such rates of ferriage as the board of aldermen of said city shall from time to time judge the best interests of the said city to require, excepting only as hereinafter provided."

The other provisions of that statute are sufficiently stated in the opinion.

" That after the passage of said act, the city of Boston purchased the franchise and property of said East Boston Ferry Company for the sum of two hundred and seventy-five thousand dollars, the purchase to go into effect April 1, 1870, and has ever since maintained and operated said ferry.

" That on February 11, 1870, the city council passed an ordinance called ' An ordinance to establish a board of directors for the East Boston ferries,' providing for the election annually of a board of directors, who should hold their respective places until others should be elected to fill them, and giving said directors the general care and management of the East Boston ferries, and for that purpose giving them all the powers vested in the city council, so far as the same could be legally delegated; and further providing for the establishment of rates of toll, to be based on an income sufficient to cover the current expenses of maintaining the ferries, and the payment of the interest on the ferry scrip; and the petitioner asks leave to refer to said ordinance as printed among the ordinances of said city." Ordinances of Boston, (ed. 1876.) 293.

That on March 24, 1870, the board of aldermen fixed the rates of toll to be collected according to a schedule annexed, (in which the ferriage for each foot passenger was fixed at two cents,) " and the said tolls so fixed are now the lawfully established tolls which said city council and said ferry directors are bound by law to collect;" and that the present board of ferry directors consists of seven persons, whose names were given.

" That inasmuch as said city council, upon the completion of the purchase of said ferry, considered and determined whether the interest of the city would best be promoted by maintaining said ferry thereafter free of tolls, and did not decide the same in the affirmative, but on the contrary determined to impose tolls and to maintain the ferry as a toll ferry, under the management of a board of directors as aforesaid, the said city became thereupon bound to maintain the said ferry as a toll ferry, and to collect the tolls fixed or to be fixed by the board of aldermen as aforesaid, and that until other rates of toll shall be fixed by said board, it is the duty of the said city, and of the said ferry directors, by virtue of said statute and ordinance, to collect the tolls now established as aforesaid by said board of aldermen.

" That the said city council, regardless of its duty to maintain said ferry as a toll ferry, and pretending that it still has, after the lapse of more than seven years since the purchase of said ferry, the power to establish a free ferry which was expressly given to them to be exercised only upon the completion of the purchase, did, on July 30, 1877, pass an order in the following terms, viz. ' Ordered, that on and after the first day of January, 1878, the tolls on the East Boston ferries be abolished, and the said ferries be run free to the public travel.'

" That the said statute of 1869, *c.* 155, so far as it purports to authorize said city to run said ferry free of tolls, is unconstitutional and void, and that said last-named order was passed without authority, and is wholly inoperative, illegal and void.

" That the said city of Boston and the said board of directors intend, in pursuance and under color of the supposed authority and requirements of said illegal order, to cease collecting tolls on said ferry on and after said January 1, 1878, and to maintain said ferry as a free ferry on and after that date, and to assess the whole cost of maintaining said ferry on the taxpayers of said city."

The information and the petition each prayed for an alternative writ of mandamus to the city of Boston, and to the board of directors for the East Boston ferries, commanding them to continue, after January 1, 1878, to collect the tolls established as aforesaid, or such other tolls as may be hereafter established by the board of aldermen of said city, according to law, or show cause why they should not do so.

The city of Boston and the board of directors for the East Boston ferries filed general demurrers to the information and petition respectively, and the cases were thereupon reserved by *Morton*, J., for the determination of the full court.

*J. G. Abbott & E. R. Hoar*, for the city of Boston.

*W. G. Russell*, ( *G. Putnam, Jr.*, with him,) for the attorney general and the petitioners.

GRAY, C. J.   These are applications for a writ of mandamus to compel the city of Boston (which in 1870 purchased and now holds the franchise and property of the East Boston Ferry Company) and the board of directors for the East Boston ferries (to which the city council has committed the general care and man-

agement of the ferries) to continue to collect the tolls established by the board of aldermen upon those ferries. The respondents have filed general demurrers, thereby admitting all the facts alleged ; and the prayer for a writ of mandamus to the board of directors having been waived at the argument, the matter to be determined is whether, upon the facts alleged and admitted, such a writ should be issued to the city of Boston.

The questions presented are of such public interest and importance, that they have, with the assent of counsel, been considered by all the judges, and the opinion now announced is the unanimous judgment of the whole court.

The main question is of the validity of the order passed by the city council on July 30, 1877, in the following terms : " Ordered, that on and after the first day of January, 1878, the tolls on the East Boston ferries be abolished, and the said ferries be run free to the public travel."

By the St. of 1869, *c.* 155, § 1, the city council was authorized to purchase the franchise, boats and other property of the East Boston Ferry Company, and to cause the ferry to be maintained " in such manner and upon such rates of ferriage as the board of aldermen of said city shall from time to time judge the best interests of said city to require, excepting only as hereinafter provided."

The subsequent sections of this statute offered to the choice of the city council three modes of proceeding. The first was that by § 2, " upon the completion of said purchase, the said city council shall consider and determine whether the interests of said city will be best promoted by maintaining said ferry thereafter free of tolls," and if this was decided in the affirmative, then the city was to maintain and operate " the said ferry thereafter free of all tolls ; " and in such case the board of aldermen was to adjudge and determine whether East Boston and Breed's Island, or any and what part of them, would " receive any benefit and advantage therefrom beyond that general advantage which will be received therefrom by other portions of said city," and what portion of the cost of such purchase should be borne by the city and what portion by the owners of real estate in the territory so adjudged to be benefited ; and by §§ 3, 4, provisions were

made by which the .atter portion of the cost should be assessed upon and collected of such owners of real estate.

The second mode was that, by § 5, the city council, "upon the completion of said purchase," might adjudge and determine that, " instead of maintaining said ferry free of all tolls, it is for the best interests of said city that the said ferry shall be thereafter operated with more boats and greater facilities for travel and business than are now furnished by said company, and at one cent ferriage for a foot passenger, instead of two cents as heretofore charged, and with the other rates of ferriage thereon so reduced that the receipts of said ferry annually shall not exceed the cost of operating the same, instead of paying, as provided by the charter of said company, at least eight per cent. annual dividends ; " and in such case the city was to maintain and operate the ferry accordingly, " or with such other and still greater accommodations and at such more reduced rates of ferriage as the said board of aldermen may from time to time judge expedient."

The third mode was that, by § 6, the city council, "instead of adjudging to maintain said ferry free of all tolls, as provided in section two," might adjudge and determine " that it is for the best interests of said city that the said ferry shall be maintained free of tolls for a term of not less than ten years next succeeding said purchase, and thereafter upon such rates of ferriage as may then be adjudged by said city ; " and in such case the city was to maintain and operate the ferry " for and during a term of not less than ten years next succeeding said purchase, free of all tolls, but in all other respects as provided by section five."   In case of the adoption of the second or the third mode of proceeding, provision was made for assessing and levying not exceeding one half of the cost of the purchase upon the estates adjudged to be benefited.

By these provisions, the Legislature has unequivocally manifested its intention that the question whether the ferry, as maintained by the city, should be a free ferry, or a toll ferry, or for a certain time the one and afterwards the other, should be determined by the city council, once for all, as soon as the purchase should be completed.   This appears, not only from the usual and natural meaning of the words " upon the completion of said pur-

chase," " thereafter," and " for a term of not less than ten years next succeeding said purchase," and from the contrast of these words with the words " from time to time " in the clauses directing the board of aldermen to fix the rates of ferriage; but also from the provisions for ascertaining whether any territory is specially benefited, and for assessing and levying a part of the cost of the purchase upon the real estate in that territory. These provisions clearly show that the ferries are not to be made free, either permanently or temporarily, without assessing a part of the cost of the purchase on the owners of the estates which will receive a peculiar benefit therefrom; and that those owners, who are thus to bear a part of the cost, as well as the taxpayers of the city, who are to bear the burden of the rest, shall know at once the rule and measure of their liability.

It follows that the order by which the city council has undertaken to abolish the tolls, more than seven years after the completion of the purchase of the ferry, and when no portion of the cost can be assessed upon the estates specially benefited, is not within any authority which the second and subsequent sections of the St. of 1869 purport to confer.

Recurring now to the first section, it appears to us to be equally clear that the provision directing the city to cause the ferry to be maintained, " in such manner and upon such rates of ferriage " as the board of aldermen may from time to time determine, obliges the city to maintain the ferry as a toll ferry. The words " in such manner " are evidently used to signify only the way in which the ferry shall be practically run and carried on. If they had been intended to include the matter of tolls, the additional words " and upon such rates of ferriage " would have been wholly superfluous. To construe the words of this section as authorizing the city to abolish all rates of ferriage whatever would be a strained interpretation of the words themselves, and would contravene the general scheme and purpose of the Legislature as apparent upon a view of all the provisions of the statute.

The position that the order of the city council is justified by the original act of incorporation of the East Boston Ferry Company is equally untenable. That statute did authorize the city to purchase the ferry, and, after such purchase, " to collect and

receive the same rates of toll as are allowed by the second sec-
tion of this act to said company." But it was only when the
tolls collected on the ferry should be sufficient to reimburse the
city for the cost of the ferry, with the annual interest on the
scrip issued by the city in payment of such cost, and for all
the expenses of the repairs and additions to the ferry, and all
current and incidental expenses of its superintendence and man-
agement, and to provide a sufficient fund for the future support
of the ferry, that it was provided that "then the tolls on said
ferry shall cease, and said ferry shall ever after be maintained by
said city of Boston as a free ferry." St. 1852, c. 244, §§ 9, 11.

The conclusion to which we are brought by a consideration of
the provisions of these statutes is confirmed by referring to the
meaning of the word "ferry" at common law and in the earlier
statutes of Massachusetts.

The definition of a ferry in the early books is "a liberty by
prescription, or the King's grant, to have a boat for passage upon
a great stream for carriage of horses and men for reasonable
toll." Termes de la Ley (1st Am. ed.) 223. Jacob's Law Dict.
Ferry. And according to all the authorities, English and Amer-
ican, the grant of a ferry, in its very nature, implies the taking
of tolls by the grantee. Hale de Jure Maris, c. 2 ; Hargr. Law
Tracts, 6. Woolrych on Ways, 217. Parke, B., in *North &
South Shields Ferry* v. *Barker*, 2 Exch. 136, 149. 2 Dane Ab.
683, 684. *Fay, petitioner*, 15 Pick. 243, 249, 250. *Newburgh
Turnpike* v. *Miller*, 5 Johns. Ch. 101, 112. *Aikin* v. *Western
Railroad*, 20 N. Y. 370, 379, 386.

So far as we have been able to inform ourselves by a careful
search, the only ferries known to the ordinances and statutes of
Massachusetts from the first settlement of the Colony to the pres-
ent time have been toll ferries. 1 Mass. Col. Rec. 81, 87, 88,
148, 241, 275, 304, 338, 341. 2 Mass. Col. Rec. 32, 90, 154, 244,
262. 4 Mass. Col. Rec. pt. i. 253, 296, 433 ; pt. ii. 103. Mass.
Col. Sts. (ed. 1660) 28 ; (ed. 1672) 50 ; Anc. Chart. 110. Prov.
Sts. 1694–5 (6 W. & M.) c. 16; 1710–11 (10 Anne) c. 1;
1711–12 (11 Anne) c. 8; 1724–5 (11 G. I.) c. 12; 1726–7 (13
G. I.) c. 14; 1728–9 (2 G. II.) c. 18 ; 1 Prov. Laws (State ed.)
183, 651, 683 ; 2 Prov. Laws, 340, 407, 519 ; Anc. Chart. 280
448. St. 1796, c. 42. Rev. Sts. c. 26. Gen. Sts. c. 47. **Towns**

have sometimes been authorized to maintain ferries at places where no person would undertake to keep them, but only when judged necessary by the court of sessions or county commissioners, and at rates of toll established by them. Prov. St. 1760 (33 G. II.) Anc. Chart. 623. St. 1796, *c.* 42, § 4. Rev. Sts. *c.* 26, §§ 2, 7. Gen. Sts. *c.* 47, §§ 2, 6. As was said by Mr. Dane, " Thus, by statute law, our ferries ever have been and are established and kept up for a stated toll or fare." 2 Dane Ab. 684. The exemption of certain public officers, as by the colonial statutes, or of the inhabitants of particular places, by custom, from the payment of the tolls to which all others are subject, does not affect the character of a ferry. 4 Mass. Col. Rec. pt. i. 433. *Paine* v. *Partrich,* Carth. 191, 194.

It may also be observed, though hardly necessary to the present decision, that every grant from the sovereign authority is, in case of ambiguity, to be construed strictly against the grantee and in favor of the government, and is not to be presumed to confer rights or powers not clearly expressed or reasonably to be implied from its terms and from the nature of its subject. This rule has been freely applied to cases of grants by the Legislature to municipal or other corporations of interests or rights in or concerning ferries. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420. *Mills* v. *St. Clair County,* 8 How. 569. *Minturn* v. *Larue,* 23 How. 435. And it has been held that a city, authorized by its charter to build wharves on its own property, and to obtain by contract or purchase the title or the control of other wharves in the city, and to raise a revenue therefrom by establishing and collecting a rate of dockage and wharfage, had no power to take a lease of a wharf containing a provision that it should be kept as a free wharf. *Mobile* v. *Moog,* 53 Ala. 561.

As, for the reasons already stated, we are of opinion that the order, by which the city council has undertaken to abolish the tolls on the East Boston ferries, and to direct that they shall be run free to the public travel, is illegal and void, because it exceeds the powers which the statutes purport to confer upon the city, we are not required to consider the other and most important question, argued at the bar, whether it is within the power of the Legislature, under the Constitution of the Commonwealth, to authorize a city or town to establish and maintain a free ferry

at the public expense, nor whether the provisions of the St. of 1869, c. 155, §§ 2–6, are constitutional and valid. If these provisions are unconstitutional, yet, being clearly separable and distinct, and never having been acted on by the city, they do not affect the validity of the grant of authority to purchase the ferry, contained in § 1 of the same statute, and in § 9 of the St. of 1852, c. 244.

The power of the Legislature under the Constitution to authorize a municipal corporation to maintain a toll ferry cannot, in the light of the long usage in Massachusetts, as shown by the statutes already referred to, be doubted. " The purpose of improving private property," mentioned in the St. of 1869, c. 155, § 1, as one of the reasons of the act, is not indeed a purpose for which a city can be authorized by the Legislature to expend money. *Lowell* v. *Boston*, 111 Mass. 454. *Loan Association* v. *Topeka*, 20 Wall. 655. But the mere insertion of those words in the preliminary clause in the nature of a preamble, which also fully states valid reasons for the enactment, in the purposes of protecting and facilitating travel and business between the two parts of the city, is not sufficient to warrant the court in declaring the whole section invalid.

The order of the city council being illegal and void, it is the duty of the city to continue to collect the tolls heretofore established, or which may from time to time hereafter be lawfully established by the board of aldermen, under the power conferred upon that board by the first section of the statute of 1869. To the suggestion that the aldermen may fix the tolls at nominal rates, it is a sufficient answer that they have not done so, and it is not to be presumed that they will, and that, until they do, the court has no occasion to consider whether such action on their part would be a lawful exercise of the power conferred upon them by the statute.

It is insisted by the learned counsel for the city that, assuming the order of the city council to be illegal and void, this court is powerless to restrain or control its operation before the time when it will by its terms take full effect. But this position appears to us to be unsupported by the authorities cited, and to be inconsistent with the very nature of the writ of mandamus, the power of issuing which is vested in the highest court of common

law jurisdiction, and the proper office of which is to compel, not only inferior courts, but also officers and corporations, to obey and execute the laws, especially in matters of public concern, when no other equally effectual remedy is provided.

"The reason why we grant these writs," said Lord Hardwicke, when presiding in the King's Bench, "is to prevent a failure of justice, and for the execution of the common law, or of some statute, or of the King's charter." *The King* v. *Wheeler*, Cas. temp. Hardw. 99; *S. C.* Cunningham, 155. The same idea was more fully expressed by Lord Mansfield, as follows: "A mandamus is a prerogative writ; to the aid of which the subject is entitled, upon a proper case previously shown, to the satisfaction of the court. The original nature of the writ, and the end for which it was framed, direct upon what occasions it should be used. It was introduced to prevent disorder from a failure of justice, and defect of police. Therefore it ought to be used upon all occasions where the law has established no specific remedy, and where in justice and good government there ought to be )ne. Within the last century, it has been liberally interposed for the benefit of the subject and advancement of justice. The value of the matter, or the degree of its importance to the public police, is not scrupulously weighed. If there be a right, and no other specific remedy, this should not be denied." *Rex* v. *Barker*, 3 Burr. 1265, 1267.

This court, as the highest court of law of the Commonwealth, ⸢as as extensive powers and duties in this respect as the Court of King's Bench in England. The statutes which define its jurisdiction expressly declare that "the court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein, where no other remedy is expressly provided, and may issue writs of error, certiorari, mandamus, prohibition, quo warranto, and all other writs and processes to courts of inferior jurisdiction, corporations and individuals, necessary to the furtherance of justice and the regular execution of the laws." Gen. Sts. *c.* 112, § 3. See also Prov. St. 1699–1700 (11 W. III.) *c.* 3; 1 Prov. Laws, 371; Anc. Chart. 331; Sts. 1780, *c.* 17; 1782, *c.* 9, § 2; Rev. Sts. *c.* 81, §§ 4, 5. The granting of the writ of mandamus rests in the sound judicial discretion of the court, which has cautiously abstained from lay-

ing down any limits to the exercise of this discretionary **power.**
*Commonwealth* v. *Hampden Sessions*, 2 Pick. 414, 419. *Strong,*
*petitioner*, 20 Pick. 484, 495. *Carpenter* v. *County Commission-*
*ers*, 21 Pick. 258, 259. *St. Luke's Church* v. *Slack*, 7 Cush. 226,
239. *American Railway-Frog Co.* v. *Haven*, 101 Mass. 398. In
*Strong's case*, Mr. Justice Morton said : " In every well consti-
tuted government, the highest judicial authority must neces-
sarily have a supervisory power over all inferior or subordinate
tribunals, magistrates and all others exercising public authority.
If they commit errors, it will correct them. If they refuse to
perform their duty, it will compel them. In the former case by
writ of error, in the latter by mandamus. And generally in all
cases of omissions or mistakes, where there is no other adequate
specific remedy, resort may be had to this high judicial writ. It
not only lies to ministerial, but to judicial officers. In the for-
mer case it contains a mandate to do a specific act, but in the
latter only to adjudicate, to exercise a discretion, upon a partic-
ular subject."

Neither the fact that the respondent is a municipal corpora-
tion, nor the fact that the board of aldermen has a discretionary
power to fix the rates of toll, affords any reason why the city
should not be compelled by mandamus to perform the duty, im-
posed upon it by law, of running the ferry as a toll ferry. In
*East Boston Ferry Co.* v. *Mayor & Aldermen of Boston*, 101
Mass. 488, a writ of mandamus was issued on the application of
the East Boston Ferry Company, before the purchase of the
ferry by the city, to compel the mayor and aldermen to establish
rates of toll in accordance with the St. of 1852, *c.* 244, § 2. And
in *Attorney General* v. *City Council of Lawrence*, 111 Mass. 90,
a writ of mandamus was issued to compel the two branches of a
city council to meet in convention to elect a commissioner of
streets, whose office was established only by a municipal ordi-
nance which was subject to be repealed at any time by the city
council.

It is said in Tapping on Mandamus, 10, cited for the respond
ent, that " a mandamus will not be granted in anticipation of a
defect of duty or error of conduct." But the only reference of
the learned author in support of this proposition is to *Black-*
*borough* v. *Davis*, 1 P. Wms. 48; and an examination of that

case shows that the passage referred to was but a remark of counsel, not assented to or acted upon by the court.

The case was this : A man had died intestate, leaving as his next of kin a grandmother and an aunt, and the Prerogative Court had granted administration to the grandmother, but had made no order of distribution. An application was made in the King's Bench for a writ of mandamus to the judge of the Prerogative Court, commanding him to direct distribution to the aunt as well as the grandmother. It was argued by counsel that no mandamus would lie to compel payment to legatees or to those entitled as next of kin under the statute of distributions. To this Lord Holt answered : " If the ecclesiastical judge act contrary to law, may not this court oblige him to pursue the law ? Is there any difference betwixt granting a prohibition to stop them from going wrong, and a mandamus to guide them right ? " It was further argued for the respondent, " No mandamus ought to go, at least till the court have erred, for this court will not anticipate the judgment of the spiritual court ; " or, as stated in another report, " Where a judge below is to give judgment, and it is not yet known which way he will judge, to command him beforehand to do his duty is very odd." But Lord Holt, disregarding the suggestion, said : " I would fain know how it comes to pass, that the spiritual court have not pursued the ancient civil law, but have varied that by the Novels ? " " If the spiritual court, since the statute of Car. II., shall attempt a distribution contrary to the rules of the common law, we will prohibit them ; for, by that statute, they are restrained to the rules allowed among us." And, after advisement, the court decided the case upon its merits, and refused the writ of mandamus, solely because the grandmother was nearer of kin to the intestate than the aunt. *Blackborough* v. *Davis,* 1 P. Wms. 41, 47–53 ; *S. C.* 12 Mod. 615, 621–626.

In the only other English case cited for the respondent, the master of a hospital, having refused to affix the common seal to the presentation of a person to a living, who had been elected by the majority of the corporation, was compelled by writ of mandamus to do so, although no deed of presentation had been tendered to him ; and this, not on the ground that the tender had been waived, " but because that which the master was called

on to perform was so simple." *The Queen* v. *Kendall*, 1 Q. B. 366, 386 note; *S. C.* 4 Per. & Dav. 603, 606.

The passage cited for the respondent from High on Extraordinary Remedies, § 12, substantially accords with the statement of Tapping, above quoted. But the only cases there referred to are from Maryland, Kansas and Louisiana, and differ so widely from the case before us that we need not consider whether they were well decided. In the cases in Maryland and in Kansas, the only day when the respondents could by law act upon the subject in question had either passed or had not arrived when the writ of mandamus was applied for. *Commissioners of Schools* v. *County Commissioners*, 20 Md. 449. *State* v. *State Canvassers*, 3 Kansas, 88. The cases in Louisiana were attempts by a creditor of a municipal corporation, or of the state, to secure a priority by writ of mandamus to its treasurer to pay the debt of the petitioner; and the writ was refused, in the one case, because it appeared by the record that the proceedings were fictitious and collusive, and, in the other, because the treasurer had not received the money and could not therefore be in fault in not paying it. *State* v. *Burbank*, 22 La. Ann. 298. *State* v. *Dubuclet*, 24 La. Ann. 16.

Applications for writs of mandamus being addressed to the sound judicial discretion of the court, the circumstances of each case must be considered in determining whether a writ of mandamus shall be granted; and the court will not grant the writ, unless satisfied that it is necessary to do so in order to secure the execution of the laws. But when the person or corporation against whom the writ is demanded has clearly manifested a determination to disobey the laws, the court is not obliged to wait until the evil is done before issuing the writ.

In the case of *The King* v. *The Lord of the Hundred of Milverton*, 3 A. & E. 284, a court leet was proved to have been held, as long as the deponents could recollect, in October annually, and to have been held by the present lord in October 1833. He had been requested to hold a court in October 1834, and had taken no steps in consequence of the request, but did not appear to have expressly refused to hold the court. An application to the court of King's Bench on November 24, 1834, for a writ of mandamus to compel the holding of the court, was op-

posed by Sir William Follett, upon the ground that the court could only be held in October, and that " the utmost that could be done would be to compel the holding of the court in October next; but as the lord has not absolutely refused, that cannot be done in the present case "— clearly implying that, if he had absolutely refused, it could be done. Sir Frederick Pollock replied, " Practically, the question is, whether this court leet is ever to be held at all; for if the court will not grant the mandamus to hold at the proper time, before that time arrives, and if, after the time has past, the mandamus cannot be granted to hold at any other time, there are no means of enforcing the performance of the duty, and the objection would destroy the general power of this court to enforce the holding of courts leet by mandamus." The court, simply observing that it was doubtful whether any charter or prescription existed, limiting the time, and that such a limitation could not be assumed, and that great public inconvenience might accrue if a mandamus were refused on such grounds, ordered the writ to issue.

In *The Queen* v. *Eastern Counties Railway*, 10 A. & E. 531; *S. C.* 2 Per. & Dav. 648, and 4 Per. & Dav. 46; it was held that a railway company which had purchased lands and begun works on a part only of the line authorized by its charter, and which, as the affidavits showed reasonable cause for believing, intended to abandon the rest of the line, might be compelled by mandamus to complete its line, although the application for the writ was made long before the expiration of the time allowed by act of Parliament for such completion. See also *Attorney General* v. *Birmingham & Oxford Railway*, 4 De G. & Sm. 490, 498. To the same effect were the decisions of the Queen's Bench in *The Queen* v. *York & North Midland Railway*, 1 E. & B. 178, *The Queen* v. *Lancashire & Yorkshire Railway*, 1 E. & B. 228, and *The Queen* v. *Great Western Railway*, 1 E. & B. 253. The judgments in the Exchequer Chamber in 1 E. & B. 858, 873 note, 874, which reversed some of these decisions, went upon the ground that the acts of Parliament in question had not imposed any obligation upon the defendants, without touching the point that, if they had, a writ of mandamus might be applied for before the time had expired. *Edinburgh, Perth & Dundee Railway* v. *Philip*, 2 Macq. 514, 526.

In *Webb* v. *Commissioners of Herne Bay*, L. R. 5 Q. B. 642, commissioners were incorporated by act of Parliament for the purpose of improving a town, and were empowered to levy rates, to borrow money, and to issue debentures. A holder of such debentures moved for a mandamus to compel the commissioners to apply their funds in payment of the interest thereon. It was objected that rates might not be levied, and that the form of the mandamus should have been to levy rates out of which to pay the interest on the debentures. But the court held that the mandamus should issue as prayed for, and said that if the commissioners should not levy rates, the petitioner would be entitled to another mandamus to compel them to do so.

In a very recent case in this court, a statute authorizing the city of Boston, for the purpose of abating a public nuisance, to raise the grade of lands in a particular district, and to assess the expense thereof upon the owners of the lands, provided that any person entitled to any estate in such land, and dissatisfied with the assessment, might give notice to the city council, and thereupon the city should take his land, and within sixty days thereafter file in the registry of deeds a description thereof, together with a statement that it was taken under the statute, which description and statement should be signed by the mayor, and the title to the land so taken should vest in the city. The owner of an estate in such land, being dissatisfied with the assessment, gave notice accordingly and offered to surrender his estate to the city. The city council neglected to take it, and passed an order vacating the assessment. The owner applied for a writ of mandamus to the city council and to the mayor, both of whom in their answers relied on the order vacating the assessment. It was held that, as soon as the assessment was made, the owner had the right to surrender his estate, and the city council could not afterwards vacate the assessment; and that the mandamus should issue, not only to the city council to take the land, but also to the mayor to sign the description and statement, although he could not do so, or be in default for not doing so, until the city council had passed an order taking the land, and although he might by the statute sign the description and statement at any time within sixty days after the taking. St. 1873, *c.* 340, §§ 1–4. *Farnsworth* v. *Boston*, 121 Mass 173.

It is argued that it does not appear that the city has been requested and has refused to do the act sought to be enforced, and that therefore the writ of mandamus should not be issued. But, as Lord Denman observed, it is not necessary that the word "refused" or any equivalent to it should be used, "but there should be enough to show that the party withholds compliance and distinctly determines not to do what is required." *The King* v. *Brecknock & Abergavenny Canal,* 3 A. & E. 217, 222; *S. C.* 4 Nev. & Man. 871.  See also *The King* v. *Lord of Milverton,* above cited; *The King* v. *East India Co.* 4 B. & Ad. 530; *The King* v. *Archdeacon of Middlesex,* 3 A. & E. 615; *S. C.* 5 Nev. & Man. 494; *The Queen* v. *St. Margaret's Vestry,* 8 A. & E. 889; *S. C.* 1 Per. & Dav. 116; *Maddox* v. *Graham,* 2 Met. (Ky.) 56.  As a general rule, indeed, there must have been an express demand of that which the party moving for the writ desires to enforce.  Tapping on Mandamus, 283, 284. *United States* v. *Boutwell,* 17 Wall. 604, 607.  But where a municipal corporation or board has distinctly manifested its intention not to perform a definite public duty, clearly required of it by law, no demand is necessary before applying for the writ. *Commonwealth* v. *Commissioners of Allegheny,* 37 Penn. St. 237. *State* v. *Common Council of Rahway,* 4 Vroom, 110.

In the present case, the city of Boston, after purchasing the ferry, and running it as a toll ferry according to law for seven years, has then, by vote of both branches of the city council, ordered that on the first day of January next the tolls on the ferries shall be abolished and the ferries run free to the public travel.  This order, unless controlled by the process of this court, will go into operation without further action on the part of the city, and shows such a deliberate assertion of an authority not conferred by law, and determination not to perform the duties required of the city by the statutes of the Commonwealth, as to make a peculiarly strong case for issuing a writ of mandamus.

It is finally contended that neither the attorney general nor ten citizens and taxpayers of Boston have the right to invoke the interposition of the court.  To maintain this position would be to declare that the wrong committed by the city, in violation of its public duty and to the injury of a great number of citizens, is without remedy.

A ferry is *publici juris*, and cannot be created without a license from the state, and is a thing of public interest and use. Hale de Jure Maris, *c.* 2; Hargr. Law Tracts, 6. *Blissett* v. *Hart*, Willes, 508, 512 note. *Huzzey* v. *Field*, 2 C., M. & R. 432, 440; *S. C.* 5 Tyrwh. 855, 866. *Pim* v. *Curell*, 6 M. & W. 234. The city being required by law to run the ferry as a toll ferry, it is not for the court to consider whether the ferry can be as well maintained by the city in violation of law as a free ferry, without the aid of the tolls which it is its duty to collect. We can have no doubt therefore that the attorney general, as representing the public, may properly institute this proceeding. *Wellington, petitioner*, 16 Pick. 87, 105. *Attorney General* v. *City Council of Lawrence*, 111 Mass. 90. *People* v. *Collins*, 19 Wend. 56, 65. *State* v. *Wilmington Bridge*, 3 Harrington, 312. *Sanger* v. *County Commissioners*, 25 Maine, 291. *People* v. *Regents of Michigan University*, 4 Mich. 98. *Heffner* v. *Commonwealth*, 28 Penn. St. 108, 112. *State* v. *Hartford & New Haven Railroad*, 29 Conn. 538.

The learned counsel for the city rely on *Attorney General* v. *Salem*, 103 Mass. 138, as conclusive against the application of the attorney general. But nothing was adjudged in that case, which supports the position. The decision there was that the failure of the city of Salem to establish, as required by statute, such rates, for the use by its citizens of the water supplied by the waterworks constructed by the city, as to pay the interest upon the cost of constructing and the expenses of operating those works, was neither such a usurpation of a franchise as would support an information in the nature of a quo warranto, nor such a public wrong as entitled the attorney general to maintain an information in equity. The question whether he could apply for a writ of mandamus was not before the court. The remark in the opinion, that the grievance complained of was not a public wrong in which every subject of the state was interested, and therefore could not be redressed by a public prosecution or proceeding, went beyond what the decision of the case required, and is not quite accurate. If the water rates had been collected and misapplied by the city, there would have been such a misappropriation of trust funds held by the city for a public charitable purpose, as would have supported an informa-

tion in equity in the name of the attorney general. *Attorney General* v. *Dublin*, 1 Bligh N. R. 312. *Attorney General* v. *Liverpool*, 1 Myl. & Cr. 171, 201. *Jones* v. *Williams*, Ambl. 651. *Vidal* v. *Girard*, 2 How. 127, 189, 190. *Drury* v. *Natick*, 10 Allen, 169, 178. The point decided, as already observed, was only that the case did not show such a public wrong as could be redressed by information in equity ; and the true ground upon which that decision rests is, that, when no misapplication of funds held upon a public trust and no nuisance to the public are shown, the appropriate remedy to compel performance of a duty imposed upon a corporation by statute is not by decree in equity, but by writ of mandamus at common law. *Attorney General* v. *Reynolds*, 1 Eq. Cas. Ab. (3d ed.) 131. *Attorney General* v. *Birmingham & Oxford Railway*, 4 De G. & Sm. 490, 498, and 3 Macn. & Gord. 453, 462. *Adams* v. *London & Blackwall Railway*, 2 Macn. & Gord. 118, 133. *Leominster Canal* v. *Shrewsbury & Hereford Railway*, 3 Kay & Johns. 654, 673. *Attorney General* v. *Tudor Ice Co.* 104 Mass. 239.

There is a great weight of American authority in favor of the doctrine that any private person may move, without the intervention of the attorney general, for a writ of mandamus to enforce a public duty not due to the government as such. *Union Pacific Railroad* v. *Hall*, 91 U. S. 343, 355, and cases cited. And in the analogous case of a writ of prohibition it is settled by modern decisions in England, that, when an inferior court is clearly exceeding its jurisdiction, a writ of prohibition may be issued upon the application of any person, even a stranger to the proceedings below. *Forster* v. *Forster*, 4 B. & S. 187, 199. *Mayor of London* v. *Cox*, L. R. 2 H. L. 239, 280. *Worthington* v. *Jeffries*, L. R. 10 C. P. 379. *Chambers* v. *Green*, L. R. 20 Eq. 552.

In the matter now before us, it is unnecessary to pass upon the right of the citizens and taxpayers to apply for a writ of mandamus ; because, when the attorney general is entitled to apply and does apply for the writ, it is fit that the proceeding should be under his control rather than under that of private prosecutors ; and, for the reasons already stated, upon his application it must be ordered that an

*Alternative writ of mandamus issue.*